Jacob Markowitz, J.
This is a motion by the State of New York for an injunction, pendente lite, seeking in effect to prevent the effectuating of a corporate merger. Defendant Concord Fabrics, Inc., a New York corporation, went "public” in 1968 with the sale of $4,500,000 worth of common stock. The following year, a second issue was offered to the public which brought in an additional $4,000,000. The book value of the publicly-offered shares varied at the time of the offerings between $6.75 and $7.15 a share. The market price declined from a high of $25 a share to about $1 a share at the end of 1974. Some time in 1974, the individual defendants decided to go "private” and return full ownership and control of the shares in the corporation to the Weinstein family. To accomplish this purpose, the Weinstein group formulated a new corporation called AFW Fabric Corp. At that time the Weinstein group, through personal ownership and through trusts they controlled as fiduciaries, represented 68% of the outstanding shares of Concord. These shares were transferred to AFW. In turn AFW transferred its total outstanding stock to the Weinstein group.
About the same time, the Weinstein’s engaged the underwriting firm of Shearson Hayden Stone Inc. to render an appraisal for a proposed tender-offering merger. The appraisal resulted in a figure of $3 a share. It appears that the appraiser was the son of a director of Concord. In early February of this year, a tender offer was actually made to the public shareholders of Concord by AFW. Litigation which ensued, however, forced withdrawal of the tender offer. Instead, a notice of meeting was called by Concord to approve a plan of merger at a meeting scheduled for April 10, 1975. The proxy statement, accompanying the notice, unabashedly states that the purpose of the proposed merger of AFW into Concord "is to return the Company to the status of a privately-held corporation owned by the Weinstein family. Upon consummation of the merger, the Weinstein’s will be the sole stockholders and directors of the Company, and will thus be able to *122 determine all policies of the Company, such as salaries for themselves and others, dividends and business activities, without public scrutiny and solely with regard to their own interests.” The plan also advised minority shareholders that they must either accept $3 per share for their stock, or resort to judicial proceedings as contemplated under section 910 of the Business Corporation Law for appraisal of their holdings. It is also stated in the plan of merger that "AFW owns more than the percentage of the Company’s Common Stock required to approve the merger and intends to vote such stock in favor of the merger. Accordingly, the other shareholders of the Company will be unable to defeat approval of the merger by voting against it and thus may either accept $3 per share in cash or exercise their appraisal rights.”
Upon completion of the merger, AFW’s corporate existence will cease. The merger plan is to be financed by credit advanced to Concord.
The sole issue here is whether the State has an interest in investigating and seeking to have vitiated a proposed merger or freeze out of minority stockholders under its police power, where proper grounds exist.
Under Federal law, it has been generally held that minority stockholders in freeze-out situations are relegated to their right of appraisal where a corporate purpose in going private is shown and where there has been full disclosure (Dreier v The Music Makers Group, CCH Fed Securities Law Reporters, par 94, 406; Tanzer Economic Assoc. v Haynie, CCH Fed Securities Law Reporters, par 94, 873; cf. Albright v Bergendahl, CCH Fed Securities Law Reporters, par 94, 997).
This treatment of minority stockholders has been severely criticized by a United States Security and Exchange Commissioner in a speech wherein he stated "Faced with the prospect of a force-out merger, or a market reduced to glacial activity and the liquidity of the Mojave Desert and deprived of most of the benefits of the * * * securities laws, how real is the choice of the shareholder confronting the offer of management. to acquire his shares, usually not with their own resources, but with the corporation’s resources that really belong to him and his fellow shareholders?” (A. A. Sommer, Jr., "Going Private”: A lesson in corporate responsibility.)
The SEC has sought to inject standards of fairness through the application of Federal securities laws. However, these laws *123 do not seem sufficiently broad to deal with the problem of going private.
In this State, the fiduciary relation between managing stockholders and controlling stockholders and minority stockholders has long been recognized (Kavanaugh v Kavanaugh Knitting Co., 226 NY 185).
The court in Kavanaugh (supra, p 197) upheld a cause of action based upon an inference that those in control "conceived and progressed the scheme of dissolving the corporation, irrespective of the welfare or advantage of the corporation and of any cause or reason related to its condition or future, through the desire and determination to take from the corporation and to secure to themselves the corporate business freed from interference or participation on the part of the plaintiff.”
In Blumenthal v Roosevelt Hotel (202 Misc 988), in a situation strikingly similar to the one at bar, it was held that where a "freeze out” of minority stockholders is attempted, the court will relegate the dissenting shareholders to their appraisal rights where it is shown that bad faith is merely charged generally, "but otherwise the classic elements of fraud are not spelled out.” (p 989).
In reaching its conclusion, the court in Blumenthal stated (p 990), "The principles stated in the Kavanaugh case (supra) are sound principles of law and equity, but the situation that we have in the instant case is not the same as that involved in the Kavanaugh matter.”
Since Blumenthal, there appears to have been a broadening concept of fiduciary obligations of majority to minority stockholders, so that in Williams v Bartell (34 Misc 2d 553, mod 16 AD2d 21) there appears to have been a balancing of the equities between whether dissenting shareholders must be relegated to actions at law or obtain relief in equity, depending on the peculiar circumstances and exigencies of a given situation.
The instant proceeding is brought not by individuals, but under article 23-A of the General Business Law, which is commonly known as the Martin Act, or the New York State "Blue Sky Law.” Section 352 of the General Business Law empowers the Attorney-General "Whenever it shall appear to the attorney-general, either upon complaint or otherwise, that * * * in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution *124 within or from this state, of any stocks, bonds, notes, evidences of interest or indebtedness or other securities * * * any person, partnership, corporation, company, trust or association * * * shall have employed or employs, or is about to employ, any device, scheme or artifice to defraud or for obtaining money or property by means of any false pretense, representation or promise, or that any person, partnership, corporation, company, trust or association, or any agent or employee thereof shall have made, makes or attempts to make, within or from this state, fictitious or pretended purchases or sales of securities or commodities or that any person, partnership, corporation, company, trust or association or agent or employee thereof shall have employed, or employs, or is about to employ, any deception, misrepresentation, concealment, suppression, fraud, false pretense or false promise, or shall have engaged in or engages in or is about to engage in any practice or transaction or course of business relating to the purchase, exchange, investment advice or sale of securities or commodities which is fraudulent or in violation of law and which has operated or which would operate as a fraud upon the purchase * * * any one or all of which devices, schemes, artifices, fictitious or pretended purchases or sales of securities or commodities, deceptions, misrepresentations, concealments, suppressions, frauds, false pretenses, false promises, practices, transactions and courses of business are hereby declared to be and are hereinafter referred to as a fraudulent practice or fraudulent practices”.
Where such investigation uncovers to the satisfaction of the Attorney-General that barred practices have been engaged in, he is authorized under section 353 of the General Business Law to bring an action in the name and on behalf of the People of the State to enjoin such allegedly "fraudulent practices.” Paternalistic in its design, the Martin Act was adopted to protect the public against exploitation by visionary schemes and other fraudulent practices respecting stocks, bonds and other securities (People v Federated Radio Corp., 244 NY 33; People v Tellier, 7 Misc 2d 43).
The fraudulent practices, which are the target of the Martin Act, need not be fraud in the classic sense since, pursuant to the act, the absence of scienter or intent to defraud does not relieve a defendant from liability (People v Federated Radio Corp., supra; People v Royal Securities Corp., 5 Misc 2d 907).
It would thus appear that under the broad powers afforded *125 the Attorney-General, upder article 23-A of the General Business Law, the security transactions such as are involved in this proceeding are proper targets for his scrutiny despite the fact that full disclosure of the aims of the Weinstein group have been articulated. What is disquietingly evident here is the fact that a group of insiders who are directing the reacquisition program, even controlling the appraisal of the stock are the very ones who made the company public originally, and will be the surviving shareholders in the proposed privately-held enterprise. Adding to the odium of the scheme is that fact that no real corporate purpose has been demonstrated and that the credit of a now public corporation will be used to finance a merger for the benefit of a private group.
Equity mandates fairness in all human transactions. In this State, the Legislature has seen fit to empower the Attorney-General to scrutinize security transactions so that wrong may be averted and that the small investor will not be prey to a self-interested majority either in going public or' private. For this reason the motion for temporary injunction is in all respects granted.