Edward J. Greenfield, J.
Expansion and contraction, like all movements affecting nations, institutions, individuals and corporations, create turbulence and discomfort in varying degrees of intensity, and almost inevitably, dislocations. Those affected, the threatened and the dispossessed, often turn to the courts as a last resort to protect their positions and to attempt to stave off the ultimate change.
In this case the proposed change being resisted is a consolidation or merger of two substantial corporations which will effectively eliminate all the holdings of the public at large, and vest complete control in the acquiring corporation. This elimination of public shareholders or "going private” as it has come to be called, is characterized by those shareholders as a "freeze-out”. Plaintiff, as a shareholder, has commenced a class action pursuant to CPLR 901 on behalf of all owners of common stock similarly situated, to enjoin the defendants from effectuating a merger between Libby, McNeil & Libby (hereinafter "Libby”), a food processor, canner and distributor, and Universal Food Specialties (hereinafter "UFS”), a wholly owned subsidiary of Nestle Alimentana S. A., a Swiss company (hereinafter "Nestle”). Nestle is a publicly held corporation whose shares are traded in security exchanges in Europe. It controls operating companies throughout the world which manufacture and sell food products including chocolate, coffee, tea and frozen foods. It has assets of approximately $3.4 billion, and annual sales in excess of $6 billion.
Plaintiff now moves for an injunction pendente lite against the proposed merger. Defendants, on the other hand, contend that the merger is "a consummation devoutly to be wished”, and urge denial of the temporary injunction.
The essential facts, as divulged in the papers of the respective parties, are these:
Libby is a Maine corporation licensed to do business in New York. It has annual net sales in excess of $400 million. There are outstanding 9,721,799 shares of common stock, traded on the New York Stock Exchange. In addition, there are 20,000 shares of 5lA% cumulative preferred stock outstanding.
Nestle and its affiliates began purchasing Libby shares in 1960 and have been the principal shareholders of Libby since 1967, when they acquired 36% of the outstanding common *169 stock. In 1970, its holdings increased to 51%, and they stood at 61% on May 29, 1975. On that date UFS, the Nestle affiliate holding the Libby shares, announced a cash tender offer to purchase the remaining outstanding shares of Libby common stock at 8 Vs (it . was then trading on the stock exchange at 4%), and its $1,000 convertible debentures at $700 (trading about $580 at market). In the offer to purchase, UFS announced that if it acquired more than 90% of the Libby common stock, it intended, "as soon as reasonably practicable” to merge Libby into UFS, which under Maine law could then be done without any meeting or vote of shareholders. Shareholders remaining at the merger would be paid 8 Vs per share, with dissenting shareholders having the right to appraisal and judicial determination of the fair value of their shares if they thought they were worth more.
The tender offer expired on June 13, 1975. As a result 2,966,869 shares were tendered, and UFS increased its ownership of common stock to 91.86%. It also acquired ownership of $11,988,000 (face value $15,000,000) in outstanding convertible debentures. Thereupon, UFS proceeded to purchase all of the outstanding shares of Libby’s cumulative preferred stock.
On June 10, 1975, just three days before the expiration of the tender offer, the plaintiff, as the owner of 50 shares of Libby common stock purchased in August, 1973, brought this action on behalf of itself and all other common shareholders. The original complaint sought monetary damages alone, premised upon the alleged inadequacy of the tender offer, and sought no injunctive relief. In addition to this action, the court has been informed that there are seven other class actions prompted by the tender offer, four involving debenture holders and three involving shareholders. Five of the actions are pending in the United States District Court, Southern District, one in the New York State Supreme Court, Nassau County, and one in the Superior Court of California.
Seven months after the commencement of this action, on January 26, 1976, plaintiff served an amended complaint objecting to the proposed merger between UFS and Libby, seeking compensatory and punitive damages, accounting for unjust enrichment, a rescission of sales of stock made pursuant to the tender offer and an injunction against the proposed merger. Concomitant with the amended complaint plaintiff moved for a preliminary injunction to restrain the defendants *170 from taking any further steps to consummate the UFS-Libby merger.
On oral argument of this motion, the defendant requested permission of the court to send a letter and notice to the remaining Libby shareholders, advising them of the fact that they intended to carry out a merger of UFS and Libby in 30 days, pursuant to the Maine Business Corporation Act. After several meetings with the parties concerned, the court gave its approval to the sending of such a letter, upon being satisfied that the notice contained a full disclosure that the alternative courses of action available to the shareholders were set forth with clarity and that the shareholders who elected to have their shares appraised would be permitted to withdraw that demand at any time up to 20 days after the merger. The underlying financial information, and the rights of the dissenting shareholders, including the fact that the appraisal proceedings would be conducted at corporate expense were also to be set forth. The effect of the letter would be to require anyone choosing appraisal to elect that course, subject to withdrawal, within 15 days of the notice, as provided in Maine law, so that there would be a clear understanding as to exactly how many dissenting shareholders there were. All other shareholders would either sell their shares in the market or have them canceled on the effective merger date, at which time they would receive $8,125 per share. The letter and notice made it clear that there was litigation pending in the Federal and State courts and that a preliminary injunction was being sought against the merger. The letter acknowledged that the merger might be delayed or prevented by such pending litigation and shareholders were informed of the identity of the attorneys representing the various parties should they require further information.
On February 18, 1976, the board of directors of UFS approved the plan of merger, to become effective without any further action by Libby’s board of directors or by its shareholders upon the filing of the articles of merger in Maine and in Delaware. The intended date of consummation of the merger was March 22, 1976, but UFS notified its shareholders that it would not consummate the merger so long as this motion for a temporary injunction or any application for a stay pending appeal was before the court.
Pursuant to Maine law, which controls in the case of Libby, and Delaware law which controls the corporate actions of *171 UFS, UFS and Libby are permitted to effectuate a "short-form merger” (Maine Business Corporation Act, § 904 et seq.; Delaware Corporation Law, § 253). Such short-form merger statutes are in effect in 38 States, including New York (New York Business Corporation Law, § 905). These short-form merger statutes are largely based upon section 71 of the Model Business Corporation Act of the American Law Institute. Such statutes permit a merger between a subsidiary and corporation owning at least 90% of its stock (New York and eight other States require the holding of 95% prior to short-form merger, Illinois calls for 99%). Upon the payment of the set cash price for the remaining shares, with the right of a dissatisfied stockholder to seek a judicial appraisal of the stock value in the State courts, the minority position of the 10% or less would be extinguished. Such a merger does not require the approval of either the Libby shareholders or board of directors.
Plaintiff seeks a preliminary injunction of the proposed short-form merger despite meticulous compliance by defendants with every provision of the statutory merger requirements on the grounds that the minority shareholders will suffer irreparable injury in being deprived forever of their equity position in Libby, that monetary damages will not adequately compensate them for their loss, and that an injunction is justified because the so-called "squeeze out” is unjust, fraudulent, a breach of defendants’ fiduciary obligations, and without proper business purpose.
APPRAISAL OR INJUNCTION
Until recently, the law was clear that if the statutory requirements were complied with, the exclusive remedy of dissenting minority stockholders was the right to demand appraisal of their stock. Our Court of Appeals has held that there is no inherent or constitutional right of a stockholder to preserve his status forever.
"In short, the merged corporation’s shareholder has only one real right; to have the value of his holding protected, and that protection is given him by his right to an appraisal (see Voeller v. Neilston Warehouse Co., 311 U. S. 531, 535). He has no right to stay in the picture, to go along into the merger, or to share in its future benefits. He has no constitutional right to deliberate, consult or vote on the merger, to have prior notice thereof or prior opportunity to object thereto. His *172 disabilities in those respects are the result of his status as a member of a minority, and any cure therefor is to be prescribed by the Legislature, as it sees fit. In none of this do we see any deprivation of due process, or of contract rights.” (Beloff v Consolidated Edison Co., 300 NY 11, 19.)
"The remedy of an appraisal and payment for one’s shares affords fair and just compensation to dissenting stockholders while allowing the overwhelming majority to proceed with the merger. (See Anderson v. International Mins. & Chem. Corp., 295 N. Y. 343.) So long as the value of petitioner’s interest is compensable, he has no constitutionally protected right to continue as a stockholder”. (Matter of Willcox v Stern, 18 NY2d 195, 202.) (See, also, Grimes v Donaldson, Lufkin & Jenrette, 392 F Supp 1393, 1403; Greene & Co. v Schenley Ind., 281 A2d 30 [Del]; Borden, Going Private — Old Tort, New Tort or No Tort?, 49 NYU L Rev 987, 1020-1021; Vorenberg, Exclusiveness of a Dissenting Stockholder’s Appraisal Right, 77 Harv L Rev 1189, 1199.)
Our Court of Appeals did point out however in the Willcox case that "equity will act — despite the existence of an appraisal remedy — where there is fraud or illegality” (supra, p 204). Thus, the Legislature, by clear choice, had declared public policy would permit a corporate takeover by an entity overwhelmingly in control, whether a minority claimed to be victims of a "squeeze out”, "freeze out” or "push out”. The solitary caveat in Willcox about possible equitable intervention remained solely as a warning footnote to curb predatory appetites. A Delaware court commented, however, "it is difficult to imagine a case under the short-merger statute in which there could be such actual fraud as would entitle a minority to set aside the merger.” (Stauffer v Standard Brands, 41 Del Ch 7, 10.)
Then, in the wake of a depressed securities market, a spate of "going private” cases began to flood all the courts, as the economic climate made it conducive for control groups to buy up publicly held shares. It became manifest that in some instances, some persons were taking undue advantage of their manipulative powers, and in recoil the courts were called upon to expand the armamentarium of available remedies.
Thus, in People v Concord Fabrics (83 Misc 2d 120, affd 50 AD2d 787), the company had gone public, selling its shares at $15 to $20 each. A few years later, in 1974, the price of the stock had fallen to $1 per share and the controlling stockhold *173 ers (a family corporation) proposed a merger of Concord with their family corporation, with the public shareholders to be bought out at $3 per share, only a fraction of what they paid. Further, it appeared corporate funds would be used for the acquisition. Mr. Justice Markowitz of this court held that in a proceeding brought under the Martin Act (New York General Business Law, art 23-A) the Attorney-General of the State could ask a court to enjoin "fraudulent practices” (General Business Law, § 352). He pointed out that the action was not brought on by individuals who have a right of appraisal, but by the Attorney-General under his police powers. The court found that there was no real demonstrated corporate purpose for the merger other than the reacquisition of control by the original insiders to their great profit. Referring to the "odium of the scheme” and the averting of a wrong so "that the small investor will not be prey to a self-interested majority” (p 125) the court granted the Attorney-General’s application for an injunction pendente lite. This decision was affirmed by the Appellate Division. A dissenting opinion objected that the grant of the injunction did violence to the statutory procedures for effectuating mergers inasmuch as there was no tendency to deceive or mislead, and there had been full disclosure of the plan and its purpose.
The United States Court of Appeals for the Second Circuit, passing on the same merger, held it to be in violation of rule 10b-5 of the Securities and Exchange Act. (Marshel v A.F.W. Fabric Corp.; Swift v Concord Fabrics, 533 F2d 1309). The court held that a cause of action under the Securities and Exchange Act was stated "when controlling stockholders and directors of a publicly-held corporation cause it to expend corporate funds to force elimination of minority stockholders’ equity participation for reasons not benefiting the corporation but rather serving only the interests of the controlling stockholders”. A preliminary injunction was thus granted by the Federal courts as well as against the proposed merger. "No proper corporate purpose” appeared to have become a bar to otherwise legal mergers under both State and Federal law.
Shortly thereafter the United States Court of Appeals, Second Circuit, followed with its decision in Green v Santa Fe Ind. (533 F2d 1283). In that case a merger was proposed to eliminate a 5% minority interest in a corporation at a price of $150 per share. It was the contention of the minority that the actual per share value was $772. The allegations were that *174 this was a fraud and breach of fiduciary duty without any justifiable corporate purpose, since the surviving corporation would remain exactly as it had been before the buy-out of the minority. The court, on a motion to dismiss the complaint, held that a case of fraud was alleged within the meaning of subdivision (b) of section 10 of the Securities and Exchange Act (US Code, tit 15, § 78j, subd [b]) and rule 10b-5 of the Rules of the Security Exchange Commission. (17 CFR 240.10b-5.) It declared (p 1286): "[T]he fact that a shareholder claiming fraud both in the consummation of a merger not based on any justifiable corporate purpose and in the undervaluation of his shares may under state law only resort to an appraisal proceeding that merely ameliorates the undervaluation does not foreclose the right of the Congress and the federal courts to provide that claimant an additional right and remedy to redress any injury flowing from a fraud inherent in the merger itself’.
Judge Moore, dissenting strongly, pointed out that the majority decision would improperly create a Federal common law of corporations, negating the proper power of the States to regulate the mergers of the corporations they had franchised. He objected to what he characterized as "an irrebuttable presumption that use of the short-form merger law amounts to a fraud per se” (p 1299). Whether that be so or not, the majority, taking the allegations of the complaint as true, found that the shares were grossly undervalued, that the merger had no justifiable business purpose, and that it constituted manipulation and deception in violation of the breach of fiduciary duty owed to the minority shareholders. Important to its decision was the fact that under the Delaware law the minority shareholders had no opportunity prior to the effective date of the merger to apply to any court for injunctive relief. It was expressly stated that a claim of excessively low valuation would not constitute a violation of rule 10b-5, but that a valid claim would be asserted were it established that there had been a breach of fiduciary duty by the majority in dealing unfairly, in effectuating a merger without any justifiable business purpose, and without any opportunity in State courts to apply for injunctive relief (p 1960).
This court of course, as a State court, does not concern itself with the availability of Federal remedies under rule 10b-5. Whether the disclosed purpose of the acquisitors, if not deemed worthy, gives rise to a claim of fraud under the *175 Securities and Exchange Act, is a matter for the Federal courts. Whether a merger meets the statutory and equitable requirements of State law is solely a matter for the State courts. The challenge raised in this case calls for the court to rule not upon the issue of whether there has been compliance with the short-form merger statute, but apart from that, whether there has been any fraud or breach of fiduciary duty, and whether there is any validly demonstrated corporate purpose.
In passing upon whether these additional requirements are to be imported into the proceedings, the court at the outset must be wary of acting precipitously to upset a procedure which has been given express legislative sanction because of an emotional reaction or instinctive predisposition to sympathetic presentation. Skill in choosing appropriate semantic labels may foreshadow the outcome. The claim of "freeze-out” by a predatory majority using their power as insiders to mulct corporate funds and to overreach in order to unjustly enrich themselves tends to lead a sympathetic court to look indulgently upon extrastatutory remedies.*
The obverse of the minority claim, however, may well be that an obdurate and obstructionist minority is engaged in a "hold-up” of legitimate majority desires, motivated solely by greed for the top dollar obtainable. The crime of "self-interest” is always attributable to the other side. How the court reacts emotionally to a linguistic barrage or to a sympathetic factual presentation should not be the determinant. Objective adherence to the law should avoid both the "creative” distortion of remedies and the automatic stamp of approval of that which is manifestly inequitable. Whether a picture is presented of malevolent piracy or of beneficent paternalism must be decided on the facts of each case, and not on the ready application of labels.
*176 Unlike the situation in Green, where the motion before the court was for dismissal of the complaint and the allegations of the complaint had to be construed most favorably to the plaintiff, the present application for injunctive relief requires much closer scrutiny, and requires a much weightier evidentiary showing than mere conclusory allegations. Thus, we require that before a preliminary injunction is granted, it must be demonstrated that the plaintiff has a clear likelihood of success on the merits (Hartford v Resorts Int., 43 AD2d 828; Damon Creations v James Talcott, Inc., 39 AD2d 677); that unless the injunction is issued the plaintiff will be irreparably injured, and that an award of money damages will not adequately compensate him (Foley v D’Agostino, 20 AD2d 770; Gilbert v Burnside, 6 AD2d 834); that plaintiff has no adequate remedy at law; and that the grant of the injunction will not do greater damage than the denial (Gilbert v Burnside, supra).
LIKELIHOOD OF SUCCESS — OVERREACHING
This court is called upon to pass on the compliance of a merger plan with State law, even though not the State law of this jurisdiction. It does not, and has no occasion to pass upon what a Federal court might do if rule 10b-5 were to be invoked. Accordingly, taking into account the most recent cases, we must conclude that there is no basis for equitable intervention in a proposed short-form merger which complies with every requirement of State law unless (1) fraud or illegality clearly be shown, or (2) there has been concealment or nondisclosure of material facts, or (3) that the merger is merely a device to deal inequitably with the minority and has no valid business purpose, or (4) that there has been a breach of fiduciary responsibility.
The court must then inquire as to whether any of these conditions, not spelled out in the statute, justify equitable intervention.
Is there a breach of fiduciary duty owing by the majority stockholders to the minority? The basic principle, as set forth in Kavanaugh v Kavanaugh (226 NY 185), is always controlling, that a scheme conceived solely for the benefit of controlling stockholders without regard to the welfare of the corporation or of the minority constitutes a breach of the fiduciary obligation. That is the basis, I would suppose, of the requirement that there be a showing of legitimate corporate purpose
*177 (People v Concord Fabrics, 83 Misc 2d 120, affd 50 AD2d 787, supra). But as much of the factual background in this case demonstrates, the merger here was not actuated solely by motives of personal greed (although self-interest will not in and of itself invalidate the transaction). See dissenting opinion of Moore, J., in Green v Santa Fe Ind. (supra, pp 1997, 1998). Unlike Concord Fabrics and similar "going private” situations, we do not have here manipulation by an inside group which sold the stock high in "going public” and repurchased it low to its benefit. Nestle acquired its position in Libby stock over an extended period of time, and not in any apparent effort to milk the assets for its own benefit. Nestle made its first purchase of Libby common stock in 1960 and increased its holdings to 9% by 1963. Additional purchases increased its Libby position to 20% by 1963, and to 38% by 1967.
It appears that Libby was in serious financial difficulty by 1969; it had not paid cash dividends for eight years and incurred a net loss for fiscal 1969 of $15.3 million. Unable to meet its needs from bank loans or securities sales, Libby turned to Nestle, as its principal stockholder, for financial help. Nestle provided Libby with an unsecured loan of $10.5 million. Libby’s operating losses continued through 1970, and existing bank lines of credit were threatened. Libby’s banks urged that Nestle convert its creditor position to make further capital available to Libby.
So, in October, 1970 there was a subscription offer which gave each shareholder of Libby common stock the right to purchase additional shares on a one-for-one basis for $5.25 per share (10% below the market price). Nestle agreed to subscribe to its pro rata share and to purchase additional shares not subscribed to by the public. As a result, Nestle increased its holdings in Libby common stock to over 51%, and the banks agreed to extend credit to Libby upon the condition that Nestle maintain its majority interest. Thus, it appears that the buildup in position was clearly for the purpose of bolstering the corporation in which control was acquired, rather than milking it or raiding its assets. It should be noted that appropriate clearance was obtained from the Anti-Trust Division of the Department of Justice.
By 1974 Nestle’s ownership of Libby common stock had increased to over 60%. In 1975 the decision was made by Nestle, which already controlled Libby for all practical purposes, to eliminate minority shareholders, and to make Libby *178 a wholly owned subsidiary. Nestle then transferred all its holdings of Libby stock to UFS, one of its wholly owned subsidiaries, and on May 29, 1975 UFS announced its tender offer to acquire the remaining common stock and convertible debentures. The tender offer explicitly stated that if sufficient shares were acquired, UFS intended to merge Libby with UFS. There was a complete disclosure of all applicable information about Libby, Nestle and UFS, their relationships, the range of stock prices, the book value of Libby stock, and the source of funds to be used to acquire the additional stock. The price offered for the shares was $8,125, which was 65% above the market price, and the highest price at which any stock had changed hands for the preceding three and one-half years. The offering price of the debentures was 20% above the market price. Unlike the situation in Concord and in Green, the offered price was not substantially below what shareholders had paid. In fact, plaintiff had purchased its 50 shares of Libby common stock in August, 1973, when the market price was about $6. As a result of the tender, almost 80% of the still outstanding shares of Libby common stock were surrendered. Since the tender offer, the Libby stock has been trading at a little over $7 per share.
As a basis for the defendants’ offer of $8,125 per share for the remaining stock, defendants have relied upon an evaluation by Lehman Brothers. As indicated in the filed papers, Lehman Brothers’ evaluation was based upon reviews of Libby’s finances, its competitive position in the canned food industry, its future operating prospects, the price-earnings multiples, the relationship of market prices to book value, and the liquidated value of Libby assets. The price they recommended was substantially greater than that accorded by the market. It was, however, less than the book value per share of $15.77. Plaintiff points to this discrepancy between the book value and the offering price, as well as the analysis of its own expert who concludes that the fair value of Libby stock is $12.27 per share.
The court at this time need not make a detailed analysis of the respective contentions of the financial experts as to the appropriate price-earnings multiples, capitalization of profit, book value, liquidity of assets, monetary trends and future prospects. It is apparent that there is no palpable or gross undervaluation, which on its face would shock the conscience of the court. The niceties and discrepancies of any possible *179 price adjustment should appropriately be left for the appraisal proceedings. (Matter of Willcox v Stern, 18 NY2d 195, 202; Greene & Co. v Schenley Ind., 281 A2d 30 [Del]).
One of the indicia of possible fraud is whether the dominant stockholders are using their own funds for the acquisition of total control, or whether they are using their control of the corporation to obtain corporate funds to finance their own acquisition. In this case, as has been indicated, up to the time of the tender offer Nestle continued to use its funds in the acquisition of Libby shares. The tender offer contemplated that the cost of acquisition of the outstanding minority interests of common stock and convertible debentures would be approximately $43 million. UFS, which had no assets other than the Libby shares which were transferred to it by Nestle and its affiliates, borrowed $8,500,000 from a Swiss bank and $25,230,000 from Nestle. Nestle repaid the Swiss bank loan, so all sums are presently owed to Nestle. It was originally contemplated that the sums owed by UFS to Nestle would be treated as a long-term debt, it being anticipated that upon maturity Nestle could make a capital contribution of the sum, extend the maturity date, or place the UFS debt with a third party. In the light of the recent Federal court rulings in Green and Marshel, defendants seem to have shifted their position somewhat. In the February 26, 1976 notice to the remaining shareholders about the merger, it is now indicated that Nestle will contribute to UFS the indebtedness incurred in connection with the acquisition pursuant to the tender offer, and will make a cash capital contribution for such remaining funds as would be required. No debt, even of a long-term nature, will be carried by the UFS-Libby merged corporation, and no Libby funds or Libby credit will have been used for stock acquisition. It was clear that this would not have been possible in any event since Libby did not have sufficient cash or liquid assets available for such use. In view of Libby’s previous financial difficulty, a requirement that it or the corporation into which it would merge should pay for the stock acquisition would cripple or bankrupt it and leave the defendants with an empty shell. The possibility that Nestle would ultimately make a capital contribution was not remote, and it now appears, in accordance with the merger notice, that any indebtedness of the merged corporation because of the cost of acquisition will be eliminated.
Interestingly, upon defendants eliminating this ground of *180 complaint, and spelling out clearly that there would be no corporate indebtedness for the cost of acquisition, plaintiff then charged that this was evidence of Nestle’s duplicity and fraud. Plaintiff argues that it was advantageous for UFS to represent in the tender offer that it would incur substantial indebtedness since the Libby stockholders, desiring not to carry the burden of the debt resulting from the acquisition of Libby’s securities, were much more ready to sell their shares at the tender price. Now, it appearing that the UFS-Libby corporation will not be burdened with any such debt, plaintiff shouts "fraud”. The simple answer is that the court is confronted only with the application to enjoin the merger. The tender offer is over and done with. There was no application to restrain that. If any shareholder sold out at the tender price because he was misled to his detriment, his remedy is monetary damages. So far as injunctive relief is concerned, no remaining shareholder, such as plaintiff, is in a position to claim that the merger is a device to facilitate a raid on corporate assets when it is clear that those assets would be left undisturbed. A comparison of Libby’s December, 1975 balance sheet with the pro forma post merger contemplated balance sheet indicates that except for the preferred stock and common stock, Libby’s finances will remain untouched.
Even in the absence of the direct use of corporate funds for acquisition of the public stock, plaintiff contends that whatever benefits may accrue as a result of the merger will accrue only to UFS and will enhance only its financial position. The fact that ultimately increased economies and earnings may recompense the investor for his outlay does not mean that he is improperly using corporate funds for himself. Every investment made must justify the risk. There is nothing illegitimate in ultimately receiving benefits through distribution of profits so long as other shareholders similarly situated can likewise participate. Once the holdings of any investor cease, he yields his claim to a share in the future.
BUSINESS PURPOSE
What, then, is the business purpose of the merger, and why must it be demonstrated? The "why” is readily answerable. Meticulous compliance with statutory requirements can still be the device for unfair dealing, human ingenuity being what it is. If the takeover represents nothing more than a naked grab for power, with no further justification, that, in and of *181 itself, may be one of the telltale signs of overreaching. That overreaching may be fraud, in its original common-law sense of deception and concealment, or it may be some other species of chicanery. The presence of a legitimate corporate business purpose, over and above the self-interest of the investors, tends to negate the "raiding” or the "milking” which might justify the courts’ equitable intervention.
In the original tender offer, its purpose was stated very simply: "The purpose of this Offer is to purchase all the outstanding shares of Common Stock of the Company not presently owned by the Purchaser and all the outstanding debentures. Except as stated below, the Purchaser does not have any plan or proposal to liquidate the Company, to sell its assets, to merge with any other person or make any other major change in its management or business. The Purchaser reserves the right, however, to adopt and implement any such plan or proposal or make any such change.”
The stockholders were then informed that if UFS managed to acquire at least 2,796,000 shares, it did intend to propose a merger between UFS and Libby. Nothing was more specifically stated with respect to business purpose, and indeed, it did not appear at that time (prior to Concord Marshel and Green) that such purpose had to be spelled out in greater detail. The letter of February 26, 1976 giving notice of the merger states: "The purpose of the Merger is to complete the acquisition by Nestle and its affiliates of all equity interests in Libby. By acquiring all such equity interests, Nestle will be in a position to enhance Libby’s role as a viable competitor in United States and foreign markets by integrating and rationalizing Libby’s operations with Nestle’s other operations for maximum overall efficiency and profitability, without being inhibited by potential claims of conflict of interest by shareholders of Nestle or Libby for the necessary reallocation of business opportunities, tax benefits and managerial, administrative and financial support and services among Libby and other Nestlé affiliates in the United States and elsewhere.”
That statement of business purpose is further amplified by the affidavits and supporting papers received on this motion. Plaintiff, which has, in this application for injunctive relief, the burden of showing that there is no legitimate business purpose which could be served by this merger, has not demonstrated that the merger is so lacking in business rationale as to excite suspicion of a naked grab for power. Libby and *182 Nestle, which would control through its wholly owned subsidiary UFS, are in allied lines in the food distribution and processing business. Barring considerations of antitrust, it is manifest that a merger could well result in synergistic savings and advantages arising from the mere act of combination. Some of the business purposes can be enumerated as follows: (1) improved management and corporate planning (since gréater resources become available); (2) existing management experience in Nestle and Libby will be mutually available; (3) savings will result from economies in centralized procurement of raw materials; (4) there will be marketing economy in joint distribution, warehousing and advertising; (5) duplication of departments and personnel can be avoided; (6) a greater diversity of products would result in the evening out of cyclical demand; (7) both companies will be in a stronger financial position with fewer problems in outside financing and with the facilitation of a more efficient cash flow; (8) in embarking on plans and programs, there will be no concern about possible conflicts of interest between Libby and Nestle; and (9) without public shareholders the company would not be subject to charges of overreaching or unfairness to the minority, and would eliminate all the time, expense and energy incurred in connection with stock transfers, dividends, proxy notices, annual reports, SEC compliance and the attendant legal problems.
Enough is shown at this stage therefore to demonstrate that the transaction is not a sham, and that the legitimate interests of mutuality make this case more akin to Grimes v Donaldson, Lufkin & Jenrette (392 F Supp 1393, 1403, supra) and Schulwolf v Cerro Corp. (86 Misc 2d 292), than to Concord, Marshel, Jutkowitz v Bourns (Cal Super, LA, 1119/75); Bryan v Brock & Blevins Co. (490 F2d 563, cert den 419 US 844); Albright v Bergendahl (391 F Supp 754) and Berkowitz v Power/Mate Corp. (135 NJ Super 36). (See, also, Brodsky, State Going-Private Laws — Dead or Alive?, NYLJ, Feb. 27, 1976, p 1, and Going Private — Is It Over?, NYLJ, March 3, 1976, p 1.)
As stated by Mr. Justice Fein in the Cerro case (supra, p 297), "There is no violation of fiduciary duty owed by the dominant stockholders to the public stockholders if there is proper corporate purpose for the merger and there has been neither fraud, self-dealing nor price manipulation and the alternatives afforded to the public shareholders are a fair *183 price fairly determined, or the statutory right to an appraisal.”
Under the Delaware short-form statute, no notice of merger is required, and the Federal courts are disturbed that this affords the remaining shareholders no opportunity to apply for injunctive relief. Under the Maine law, however (Maine Business Corporation Act, § 909), notice is to be given to shareholders. They then have a limited time within which to demand appraisal rather than accept the offered price. They also have the opportunity to seek an injunction to bar the merger, should such relief be warranted. The letter of February 26, 1976, which gave the remaining shareholders such notice, contained a full disclosure of the applicable facts, and this court attempted to see to it that the matters were set forth both completely and with such clarity that the matter could be understood without engaging a firm of securities lawyers.
Under all the circumstances, this court is not persuaded that there is any basis for barring the defendants from proceeding as the laws of the State of Maine say they may. Analysis of the arguments presented by both sides does not establish a strong likelihood of success on the part of plaintiff, since there is adequate basis for concluding that what is involved is the kind of legitimate transaction sanctioned by the statutory law, that there was no overreaching by those with a fiduciary obligation, that there was no fraud or egregious manipulation, and hence no basis for this court to enjoin the process under way.
If, upon closer scrutiny, it turns out that there has been an improper evaluation, or that there has been some unjust enrichment, adequate remedies will still be available to the plaintiff and other public shareholders. They can seek not only appraisal to fix the value of their shares if they think they should be higher than the proffered price, but they have possible claims for monetary damages which will adequately compensate. What we are talking about, after all, is money— the present value of an interest, and its future value, insofar as it is calculable. Power, position, pride — the irreplaceable and unpriceable qualities, are not here involved.
The balance of equities would certainly indicate that less damage would follow from the denial of the injunction than from calling the merger process to a halt. To do otherwise would permit a tiny minority, without an adequate factual *184 showing, to delay matters involving millions of dollars until they have been satisfied. Without ample justification and a clear showing of necessity, equity will not be the handmaiden of obstruction.
The motion for a temporary injunction is in all respects denied. The parties may, if they choose, move for an early trial on the remaining issues in this action.

 See, for example, the majority opinion in Green v Santa Fe Ind. (supra) which referred throughout to "squeeze out”, "mulcting”, "breach of fiduciary duty”, "majority enrichment”, "cunning and guile”, "sophisticated artifices”, "manipulative and deceptive devices”, "extinction of minority shareholders’ interest”, "feeding the pocket books of controlling shareholders”, "unilateral action”, "abuse of insider’s position”, "bad smell”, "perversion”, "self-dealing”, "grossly inadequate consideration”, and the like.