HOLMES, INC., RAYNHAM DERBY CLUB, INC., MASSASOIT CATERING, INC., and MASSASOIT GREYHOUND ASSOCIATION, INC., Plaintiffs

vs.

Charles F. SARKIS and James F. KELLEY individually and as partners of Frothingham Partnership, Paul T. McCUSKER, William F. GRADY, Michael S. FAWCETT, individually and as trustee of FROTHINGHAM TRUST, SK GROUP, INC., FROTHINGHAM FINANCIAL, INC., SARKIS MANAGEMENT CORP., and REVERE RACING ASSOCIATION, INC., Defendants

No. 48723

Superior Court
Commonwealth of Massachusetts

June 16, 1981

**Joel Kozol,** counsel for plaintiff
**Sidney Werlin,** counsel for plaintiff
**Richard Zinner,** counsel for plaintiff
**Sullivan & Worcester, Berman, Dittman, Engel, James S. Dittmar,** counsel for defendants

## MEMORANDUM OF DECISION AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION

### Statement of Case

The plaintiff minority shareholders have requested that this Court issue preliminary injunctions to prevent the defendants from holding a Special Meeting of Shareholders of Revere Racing Association, Inc. scheduled to be held on June 17, 1981, for the purpose of voting on a proposed merger of SK Group, Inc. into Revere, or, in the alternative, from voting their Revere shares in favor of the merger, and from taking any further action to effectuate the proposed merger.

Revere Racing Association, Inc. is a public corporation with 1,083,171 outstanding shares. On or about May 11, 1981, a proxy statement and proxy were mailed to the stockholders of Revere in connection with a special meeting of shareholders to be held on June 17, 1981. The proxy materials asked Revere shareholders to adopt an Agreement of Merger with SK Group, Inc., a Massachusetts corporation organized to effectuate the merger. SK Group is wholly owned by the defendants Charles F. Sarkis and James F. Kelley, and enterprises controlled by them. The Sarkis-Kelley Group owns approximately 30.9% of Revere's outstanding stock and controls the Board of Directors.

As a result of the merger, Revere shareholders, other than members of the control group, would receive for each share of Revere common stock $12 principal amount of a new issue of 17 3/4% subordinated debentures due in 1999, except that the holder of 99 or fewer shares would receive $12 cash per share. The shares of Revere common stock owned by the Sarkis-Kelley Group would remain outstanding, so that by reason of the merger the Sarkis-Kelley Group would own 100% of the Revere common stock through Frothingham Financial, Inc., a holding company organized for that purpose. Revere would cease to be a publicly held company, and its common stock would be deregistered.

The proxy materials delivered to shareholders claim that the merger would (1) facilitate overall restructuring to achieve greater operating efficiency in combination with various Sarkis-Kelley business interests; (2) make available to Revere otherwise inaccessible financial resources; (3) enable elimination of stockholders with interests adverse to Revere; (4) avoid conflicts of interest and the costs associated with public

ownership; and (5) provide present stockholders with an annual cash return substantially in excess of any annual dividend that Revere had ever paid or might be expected to pay in the foreseeable future. The materials also contain opinions of the Board's Transaction Committee, consisting of two directors affiliated with the Sarkis-Kelley Group and of Drexel Burnham, an investment banking firm, as to the fairness and favorability of the terms of the proposed merger.

The four plaintiffs, which together own 16% of Revere's common stock, are all corporations connected with the Raynham Dog Track, a facility owned by George L. Carney. The plaintiffs claim that Revere is about to experience a dramatic increase in its earnings owing to the imminent passage of favorable racing legislation and that the compensation that they will be forced to receive for their stock is grossly inadequate and unfair. Their verified complaint and supporting affidavits challenge the proposed transaction as a breach of the fiduciary duty owed the defendant controlling shareholders to plaintiffs and other minority shareholders, and particularly allege facts tending to demonstrate that the sole purpose of the merger is to eliminate minority shareholders; that the investment banking firm's opinion as to the price offered minority shareholders is undervalued; and that the proxy materials contain misleading statements and omissions of material fact.

### Propriety of Injunctive Relief

The standard to be applied in ruling on an application for a preliminary injunction pursuant to Mass. R. Civ. P. 65(b) was most recently stated in **Packaging Industries Group, Inc. v. Cheney,** Mass. Adv. Sh. (1980) 1189. There the Supreme Judicial Court directed:

> (W)hen asked to grant a preliminary injunction, the judge initially evaluates in combination the moving party's claim of injury and chance of success on the merits. If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party. What matters as to each party is not the raw amount of irreparable harm the party might suffer, but rather the risk of such harm in light of the party's chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.

**Id.** at 1197.

### A. Likelihood of Success on the Merits

Although the plaintiffs have challenged the legality of the proposed merger under M.G.L. c. 156B, secs. 26, 61, 62, 71, 72, 78, the Court is fully satisfied that the transaction complies with the technical requirements of the business corporation statute, and particularly with sec. 78, which enumerates the requirements of long-form mergers or consolidations. Accordingly, the sole issue presented for the Court's consideration is whether the "going private" transaction nevertheless constitutes a breach of the majority shareholder's fiduciary duty to minority shareholders.

The term "going private" or "freeze-out" has been applied to any corporate transaction in which a shareholder or group of shareholders obtains the entire equity interest in the corporation, and the public shareholders receive cash, debt or preferred stock in exchange for their shares. Although the transaction most frequently occurs as the second step in a takeover following the purchase of shares from a control group in the open market or pursuant to a tender offer, "going

private" also encompasses insiders of a company re-acquiring the public shareholdings. 1 M. Lipton & E. steinberger, **Takeovers and Freezeouts** 417 (1978). The potential conflict of interest between the insiders and the public shareholders in this type of going private transaction has resulted in close scrutiny by the Securities Exchange Commission and state courts, and has led to the development of several standards to assure substantive and procedural fairness. See generally, Borden, **Going Private: Old Tort, New Tort, or No Tort,** 49 N.Y.U.L. Rev. 987 (1974); Brudney & Chirelstein, **Fair Shares in Corporate Mergers and Takeovers,** 88 Harv. L. Rev. 297 (1974); Brudney & Chirelstein, **A Restatement of Corporate Freezeouts,** 87 Yale L. J. 1354 (1978); Greene, **Corporate Freeze-Out Mergers: A Proposed Analysis,** 28 Stanford L. Rev. 487 (1976).

Unlike a two-step freeze-out transaction, the combination of two ongoing businesses is not involved when corporate insiders take the corporation private. The controlling shareholders typically effectuate the reacquisition of publicly held stock by forming a "shell" corporation to which they contribute their shares. The shell is then merged into the corporation, with the merger agreement providing for the conversion of all stock not owned by the control group. Thus, the only material alteration in corporate structure is the forced elimination of minority stockholders and the acquisition of 100% equity interest by the control group in the surviving corporation. Commentators have identified the element of common control as the principal vice in this type of transaction. The absence of arm's length bargaining encourages the undervaluation of stock and disparate treatment of stockholders.

Courts applying state law have insisted upon more than technical compliance with merger statutes when reviewing freeze-out transactions by corporate insiders. In **Berkowitz v. Power Mate Corp.,** 137 N.J. Super. 36, 342 A.2d 566 (Ch. Div. 1975), for example, the Superior Court of New Jersey enjoined a proposed merger because the controlling shareholder had not met the burden of demonstrating that the price offered minority shareholders was fair. The insiders had paid themselves bonuses which substantially reduced recent earnings and served to deflate the "going private" price of shares. Recognizing the self-dealing nature of the transaction, the Court held that the controlling shareholders had a fiduciary obligation to treat minority shareholders fairly and the concomitant burden of proving that they had done so.

Other courts have scrutinized proposed freeze-out transactions to ascertain whether the merger serves a valid business purpose. In **Singer v. Magnavox Co.,** 380 A.2d 969 (Del. 1976), for example, the Delaware Supreme Court enunciated the following standard to judge the propriety of freeze-out transactions:

> We hold the law to be that a Delaware Court will not be indifferent to the purpose of a merger when a freezeout of minority stockholders on a cash-out basis is alleged to be its sole purpose. In such a situation, if it is alleged that the purpose is improper because of the fiduciary obligation owed to the minority, the Court is duty-bound to closely examine the allegation even when all of the relevant statutory formalities have been satisfied. First, it is within the responsibility of an equity court to scrutinize a corporate act when it is alleged that its purpose violates the fiduciary duty owed to minority stockholders; and second, those who control the corporate machinery owe a fiduciary duty to the minority in the exercise thereof over corporate powers and property, and the use of such

power to perpetuate control is a violation of that duty.

By analogy, if not **a fortiori,** use of corporate power solely to eliminate the minority is a violation of that duty.

* * *

This is not to say, however, that merely because the Court finds a cash out merger was not made for the sole purpose of freezing out minority stockholders all relief must be denied to the minority stockholders in a (long form) merger. On the contrary, the fiduciary obligation of the majority to the minority stockholders remains and proof of a proper business purpose, without more, will not necessarily discharge it. In such case the Court will scrutinize the circumstances for compliance with the . . . rule of "entire fairness' and, if it finds a violation thereof, will grant such relief as equity may require.

mId. at 979-980.

Similarly, in **Jutkowitz v. Bourns,** No. CA 000268 (Cal. Super. Ct. L.A. Co. Nov. 19, 1975), the California Court likened the forced buy-out of minority shareholders in a going private transaction to "private condemnation" and held that the elimination of a minority shareholder as the sole aim of the merger did not constitute a valid business purpose.

The mechanism used to accomplish the "private condemnation" is a merger, but no merger in any realistic sense is taking place. Two corporations are not combining their businesses with each other for business purposes. As a corporate entity separate from the majority stock interests, Newco is a sham, an ephemeral will-of-the-wisp created for no purpose other than to create the formal appearance of a merger which does not in fact exist. . . . The transparent and ephemeral purpose and existence of Newco should be disregarded and the final picture examined. When that is done, it is seen that defendant's claim is that a majority of two-thirds or more has a permanent option to use corporate money to buy back stock of the minority at fair market value without any other corporate purpose. The easy answer to the proposition is that the Corporation Code does not so provide.

**Id.**

In **People v. Concord Fabrics, Inc.,** 83 Misc. 2d 120, 371 N.Y.S.2d 550, **aff'd,** 50 App. Div. 2d 787, 377 N.Y.S.2d 84 (1975), the New York Court likewise granted a temporary injunction in an action by the Attorney General under the state blue sky law to prevent a corporation from going private. Concord Fabrics had attempted to go private at a price substantially less than either the book value or the second public offering of the stock. Corporate assets were being used to finance the cash merger and the investment banker who had rendered an opinion on the "going private" price was of questionable independence. No business purpose was served by the transaction other than the elimination of public ownership. Finally, the public shareholders had no voice in determining the transaction—the 68% controlling interest would authorize the merger pursuant to New York's long-form merger statute through the structuring of a shell intermediary. Although the issue presented was whether the state had a valid interest in vitiating a proposed freeze-out of minority stockholders under the Martin Act, the New York Court further opined:

What is disquietingly evident here

is the fact that a group of insiders who are directing the reacquisition program, even controlling the appraisal of the stock, are the very ones who made the company public originally, and will be the surviving shareholders in the proposed privately-held enterprise. Adding to the odium of the scheme is the fact that no real corporate purpose has been demonstrated, and that the credit of a now public corporation will be used to finance a merger for the benefit of a private group.

**Id.** at 124-26, 371 N.Y.S.2d at 554.

The Securities Exchange Commission has promulgated for comment rules governing freeze-out transactions which basically reiterate existing state standards. **See** SEC Release No. 34-14185 (Nov. 17, 1977). The proposals provide specific disclosure and substantive regulatory requirements for going private transactions designed to ensure fair treatment to minority shareholders. Proposed Rule 13e-3(b) enumerates a nonexclusive list of factors to determine whether a going private transaction is fair, including: (1) whether the transaction has been approved by a majority of unaffiliated shareholders; (2) whether the consideration offered to unaffiliated shareholders is fair in light of such factors as current market prices, historical market prices, net book value, going-concern value, liquidation value, and independent appraisals; (3) whether a majority of sufficiently disinterested directors, if any, of the issuer has voted to approve the transaction; (4) whether a representative of the unaffiliated shareholders participated in negotiating the terms of the transaction; (5) the purpose of the transaction; (6) the anticipated benefits to be derived from the transaction by the issuer or affiliate, including consideration of the extent to which the issuer's funds or other assets are used in connection with the transaction; and (7) the taxable consequences likely to be incurred by unaffiliated shareholders.

Confining its analysis of freeze-out transactions to closed corporations, see, **Wilkes v. Springside Nursing Home, Inc.,** 370 Mass. 842 (1976); **Donahue v. Rodd Electrotype Co. of New England,** 367 Mass. 578 (1975), the Supreme Judicial Court has yet to consider whether a controlling shareholder must demonstrate ''fairness' or a ''legitimate business purpose'' to effectuate a going private transaction which fully complies with the technical requirements of chapter 156B. The appellate court has indicated, however, that majority shareholders in a public corporation occupy a fiduciary relation to minority shareholders and must adhere to a good faith and inherent fairness standard in discharging their corporate responsibilities. See, **Donahue v. Rodd Electrotype Co. of New England, supra,** at 593 & n.20. Guided by this pronouncement, the results achieved by other state courts, and the proposed standards of the Securities Exchange Commission, the Court is of the opinion that technical compliance with the long-form merger statute does not insulate the proposed Revere-SK Group, Inc. merger from judicial scrutiny. Rather, the terms of the proposed merger should be examined to ensure that minority shareholders are treated with fairness.

Significantly absent from the record is the fact that the Sarkis-Kelley Group can authorize the transaction simply by voting its own shares. An affirmative vote of a majority of all the outstanding shares of Revere common stock is required to adopt the Agreement of Merger. This means that a total of approximately 20% of outstanding shares must be voted by individuals who are not affiliated with the control group to approve the merger, and minority shareholders therefore have some voice in the transaction. Examination of the record also reveals,

however, the lack of an arm's length transaction and the concomitant potential for abuse. The control group dominates the Revere Board of Directors and the shell corporation which was created for the sole purpose of facilitating the merger. Corporate assets are being used to finance the merger. The so-called "transaction committee" that opined on the favorableness of the transaction is comprised of individuals of dubious independence. The proffered business purposes of the proposed merger, other than the elimination of minority shareholders, are simply not substantiated by the record. Finally, the plaintiffs have offered several affidavits contesting the fairness of the "going private" substitution of subordinated debt securities for the minority's public shares. In short, the Court finds that the plaintiffs have demonstrated a likelihood that the proposed merger constitutes a breach of the fiduciary obligation owed by the defendants to minority shareholders.

## B. Adequacy of Legal Remedy

In opposition to the plaintiffs' motion for a preliminary injunction, the defendants contend that the statutory appraisal rights contained in M.G.L. c. 156B, secs. 86-98 constitute the exclusive remedy available to dissenting minority shareholders and that the plaintiffs should therefore be precluded from maintaining this action for interim injunctive relief. Section 98 of chapter 156B, however, provides:

> The enforcement by a stockholder of his right to receive payment for his shares in the manner provided in this chapter shall be an exclusive remedy except that this chapter shall not exclude the right of such stockholder to bring or maintain an appropriate proceeding to obtain relief on the ground that such corporate action will be or is illegal or fraudulent as to him.

Moreover, in **Pupecki v. James Madison Corp.,** Mass. Adv. Sh. (1978) 2340, 2344, the Supreme Judicial Court indicated that a controlling shareholder's breach of his fiduciary duty to assure that the corporation received adequate consideration for the sale of its assets would constitute "fraud or illegality" within the purview of sec. 98 entitling the minority shareholder to relief other than statutory appraisal.[1] **But cf. Joseph v. Wallace-Murray Corp.,** 354 Mass. 477, 479 (1968). This Court is similarly disinclined to relegate the dissenting minority shareholders to their appraisal rights on the facts and allegations presented in this case.

## C. Risk of Irreparable Harm

The plaintiffs have posited several claimed harms in support of their argument that they will suffer irreparable injury if the proposed merger is not enjoined, including the termination of their equity interest in Revere; the imposition of an immediate taxable exchange, and the risk of further consolidation of Revere with other Sarkis-Kelley enterprises. In the Court's opinion, only the latter prospect poses a substantial risk of irreparable harm. In the event this

---

[1] This court is also impressed by the conclusion of the Second Circuit that a violation of corporate fiduciary duty to minority shareholders should be considered fraudulent as that concept is used in SEC Rule 10b-5, 17 C.F.R. §240.10b-5 (1975). **Green v. Santa Fe Industries, Inc.,** 533 F.2d 1283 (2d Cir. 1976) rev'd. sub nom **Santa Fe Industries, Inc. v. Green,** 430 U.S. 462 (1977). cf G.L. c. 110A, §410(a)(2). While the Supreme Court has laid that view to rest, it is important that its decision indicates so clearly that it is to state law to which recourse must be had in the circumstances presented here. 430 U.S. at 474, n. 14. Accordingly, it is appropriate, notwithstanding **Sante Fe Industries, Inc. v. Green,** to look to the underlying Second Circuit decision for support in reasoning that the conduct complained of here could be considered "fraudulent" as to minority shareholders as that term is used in G.L. c. 156B, § 98. See Note, "Suits for Breach of Fiduciary Duty Under Rule 10b-5 after **Santa Fe Industries, Inc. v. Green,"** 91 Harv. L. Rev. 1874, 1890. See also Case Note, 89 Harv. L. Rev. 1917.

merger is ultimately declared to be illegal or fraudulent as to minority shareholders, the commingling of assets and liabilities between Revere and other corporate entities might render impracticable the equitable relief to which the plaintiffs are entitled, namely, the reinstatement of the status quo as it existed immediately prior to the merger vote. See, **Sonesta Hotel Corp. v. Wellington Associates,** 483 F.2d 247, 250 (2d Cir. 1973). Thus, a Court may be unable to return Revere's public shareholders to equity participation in the corporation as a result of acquisitions effectuated after the merger.

On the other hand, the defendants would suffer a substantial expenditure of funds in preparing further filings, proxy materials, and stock evaluations if an injunction were to issue erroneously. Moreover, the issuance of an injunction would undoubtedly serve to undermine the confidence of the public shareholders in the propriety of the proposed transaction even if it were ultimately to receive judicial sanction. See, **Mack v. Miskin,** 172 F. Supp. 885, 889 (S.D.N.Y. 1959).

Balancing the relative risks of harm advanced by the parties, the Court finds that the injury likely to result to the defendants if the proposed merger is enjoined outweighs the possible harm to the plaintiffs in the reverse situation. In order to ensure that an appropriate equitable remedy is available to the plaintiffs in the event the merger is declared unlawful, however, the Court hereby orders that Revere Racing Association, Inc. refrain from commingling any corporate assets with other enterprises following the successful adoption of the proposed merger agreement and pending resolution of this litigation.

### Conclusion

The plaintiffs' motion for a preliminary injunction on prayer 2 of the complaint is denied. Upon the plaintiffs posting a bond in the amount of $300,000, the Court shall issue an injunction ordering that in the event the proposed Agreement of Merger between Revere Racing Association and SK Group, Inc. is adopted at the Special Shareholders Meeting to be held on June 17, 1981, or at any meeting to which this meeting may be adjourned, Revere Racing Association, Inc. shall refrain from transferring, assigning, encumbering or otherwise disposing of its assets except in the ordinary course of business, from issuing, selling, purchasing, transferring or otherwise disposing of any of its capital stock, and from merging, commingling or combining its funds, assets, operations and businesses with any Sarkis-Kelley properties or any other corporation, said injunction to remain in effect pending the resolution of this litigation on the merits.

So ordered.

By the Court,
**William G. Young**
**Justice of the Superior Court**