Michael **TANZER** et al., Plaintiffs,

v.

Roscoe G. **HAYNIE** et al.,
Defendants.

No. 74 Civ. 4857.

United States District Court,
S. D. New York.

Jan. 7, 1976.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiffs; Philip Jones, Eric L. Keisman, Charles Trynin, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendants The LTV Corp., Jones & Laughlin Industries, Inc., and JLI-II Corp., Bernard L. Brown, Roy V. Edwards, H. M. Eitel, Harold R. Lilley, and John L. Cockrill.

Tufo, Johnston & Allegaert, New York City, for defendant Jones & Laughlin Steel Corp.

Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant Jones & Laughlin Steel Corp.

Sullivan & Cromwell, New York City, for defendants George E. Griffin, Paul Thayer, Roscoe G. Haynie, Thomas C. Graham, and William J. Stephens.

Thomas W. Smith, New York City, for defendant Lionel D. Edie & Co., Inc.

## OPINION

FRANKEL, District Judge.

The recent penchant of large public corporations to thin the ranks of public stockholders by "freeze-out" mergers or by "going private" has produced a substantial volume of litigation. The four consolidated cases at bar are part of this development.

### Facts

The actions arose out of a merger in late 1974 by which the Jones & Laughlin Steel Corporation ("J & L Steel") was absorbed by a wholly-owned subsidiary of the LTV Corporation. Defendants having moved to dismiss under Fed.R. Civ.P. 12(b)(1) and (6), the allegations of the consolidated amended and supplemental complaint are accepted as true in the familiar sense for present purposes. Those allegations may be summarized for now as follows.

Prior to the merger challenged in this lawsuit, Jones & Laughlin Industries, Inc. ("J & L Industries"), a wholly-owned subsidiary of LTV, owned approximately 81% of the outstanding shares of J & L Steel, one of the nation's largest steel producers.[1] In furtherance of the proposed merger of J & L Steel into JLI-II Corporation, a newly formed, wholly-owned subsidiary of J & L Industries, J & L Steel mailed proxy solicitation material, which is at the core of this lawsuit, to its shareholders on October 25 and 26, 1974. On November 22, the merger plan was approved by vote of J & L Steel's common stockholders, with LTV voting its 81% interest in favor of the merger.[2] On the same day, JLI-II and J & L Steel, both Pennsylvania corporations, merged under the provisions of sections 901 subd. A and 902 of the Pennsylvania Business Corporation Law, relating to the merger of two domestic corporations, 15 Purdon's Pa.Stats. §§ 1901, subd. A, 1902. J & L Steel thereby became a wholly-owned subsidiary of J & L Industries. The

---

1. LTV acquired 63% of J & L Steel's outstanding common stock in 1968. LTV transferred these shares to its subsidiary in early 1969, and the subsidiary increased its ownership to the pre-merger 81% through an exchange offer in May 1969.

2. The vote was 14,764,441 shares in favor of the merger (of which 1,789,378 shares were held by persons other than J & L Industries) and 347,391 shares opposed. Dissenting shareholders are entitled to seek appraisal, 15 Purdon's Pa.Stats. §§ 1908, subd. A, 1915, a step which a relatively small number have undertaken.

public shareholders of J & L Steel were eliminated by payment to them of $29 per share.

The first of these four lawsuits was instituted on November 18, 1974, immediately prior to the merger. The four cases eventually filed were consolidated on February 19, 1975, and an amended and supplemental complaint was served on April 7. The complaint—naming as prime defendants directors of the several corporations and the corporations themselves—alleges, *inter alia*, a series of misrepresentations and omissions in the proxy material that J & L Steel submitted to its shareholders prior to the merger, and seeks, in five counts, money damages, injunctive relief, and a declaration of rights.

Count I alleges violations of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78n(a) (1970), and Rules 10b–5 and 14a–9 promulgated thereunder, 17 C.F.R. §§ 240.10b–5 and 240.14a–9 (1975). It avers that J & L Steel had "proven and probable" crude ore reserves of approximately 513,000,000 gross tons of merchantable ore averaging approximately 64.6% iron content, as well as approximately 169,000,000 net tons of reserves of metallurgical coal, consisting of approximately 129,000,000 net tons of high volatile metallurgical coal and 40,000,000 net tons of low volatile metallurgical coal. Further, it alleges that the "present dollar value" of these iron and coal reserves is at least $406,000,000, or some $27.00 per share of J & L Steel common stock, and that this present value is nowhere reflected in J & L Steel's issued financial reports nor revealed or disclosed in the merger proxy statement. The failure of J & L Steel to have revealed these values is alleged to have operated, from before 1972 to date, "as a manipulative and deceptive device to depress the market price of J & L Steel stock."

It is further alleged that, immediately prior to the merger, J & L Steel's true current asset value was in excess of $35 per share of common stock, and that the true going concern value of its fixed assets was in excess of $100 per share. Plaintiffs also assert that the dramatic improvement in J & L Steel's earnings in 1974—from $3.12 per share for all of 1973 to $6.46 for the first nine months of 1974—when computed with a price-earnings ratio of 8.2 for J & L Steel common stock (which, plaintiffs assert, prevailed during the period 1971–73)[3] meant that "the fair market value of J & L Steel is at least $70.60 per share; and if computed with due consideration for the aforementioned asset values, is in excess of $100 per share." While LTV, it is alleged, was to benefit in various ways by virtue of the merger, the public minority shareholders were being frozen out at a grossly unfair price of $29.00 per share.

Plaintiffs then allege that defendants, in furtherance of this purportedly self-dealing freeze-out of the public shareholders, used a proxy statement that was materially false and misleading to solicit votes in favor of the merger. Although there are numerous particular charges of wrongdoing, the essential charges of material omissions and misstatements may be capsulated as follows: First, that defendants misstated the true business reason for the merger, while omitting to state that the merger would serve no business purpose of J & L Steel. Second, that defendants repeatedly gave false assurances that the directors and an "independent consultant" (Lionel D. Edie & Co.), which is included as a defendant, had determined the merger to be "fair" to the public minority shareholders, while omitting to set forth facts showing that the "actual" value of plaintiffs' stock was far in excess of $29.00 per share. Third, that the proxy statement failed to disclose

---

3. The price-earnings ratio of J & L Steel common stock as of August 26, 1974, the date used by Lionel D. Edie & Company in a

Report hereinafter considered, was 5.8, a figure that plaintiffs allege was unrealistically low.

adequately the numerous areas of conflict of interest, both among the defendant directors as well as in the ostensibly independent consultant, and the effect these conflicts had in establishing the merger price. Fourth, that defendants' true purpose in soliciting the votes of plaintiffs' class was to have the public shareholders waive their right to appraisal, and, in furtherance of this objective, defendants misled plaintiffs into thinking their votes had significance as such. Fifth, that certain allegedly material information regarding past transactions—including LTV's paying $42.50 per share of J & L Steel common in 1968, or defendants' reasons for increasing the merger price from $25.00 to $29.00 per share—was not given. Further, that certain of the beneficial effects of the merger to LTV, including consequences for LTV's consolidated income, either were not disclosed or were not disclosed in sufficient detail.

The merger itself is attacked as illegal under the Pennsylvania Business Corporation Law, in that it seeks to freeze out the public minority shareholders, while the merger plan is denounced as a "device, scheme and artifice to deceive and defraud" plaintiffs in violation of § 10(b) and Rule 10b-5.

Count I seeks damages amounting to the difference between the price of $29.00 a share and the fair value of the J & L stock held by plaintiff class. Count II, brought pursuant to the same statutory sections, alleges the same facts as Count I, and seeks damages for deprivation of the benefits and incidents of ownership. Count III is a derivative count, incorporating many of the same factual allegations as Count I, which alleges that the merger has no plausible business purpose for J & L Steel, and that the terms of the merger are so grossly unfair to J & L Steel and reflect such a clear abuse of trust as to render the merger a fraud on J & L Steel. This count seeks injunctive relief as well as a judgment declaring the plan and merger to be null and void. Count IV is brought pursuant to Pennsylvania law,

alleging the same facts as those in Count I, and seeking again the Count I and II remedies. Count V is a derivative count against all but Lionel D. Edie & Company seeking remedies identical to those sought in Count IV.

### Discussion

When the first of the now consolidated cases was brought, plaintiffs moved for a preliminary injunction. Upon the learning swiftly acquired then, the court perceived only slender prospects that plaintiffs would eventually succeed on the merits. For that and other reasons, temporary injunctive relief was denied. *Tanzer Economic Associates, Inc. v. Haynie,* 388 F.Supp. 365 (S.D.N.Y. 1974). Though more than a year has passed, the matter has not developed enough to justify any different attempt to foresee its outcome. The court does hold, however, that the consolidated amended complaint is not subject to dismissal upon defendants' pending motion under Fed.R.Civ.P. 12(b)(1) and (6).

In sufficient support of this conclusion, following the settled latitude with which complaints are read for motions of this nature, *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957), the court finds plaintiffs entitled to pursue, through discovery and, probably, a trial, their asserted claims under §§ 10(b) and 14(a) of the Securities Exchange Act of 1934 and the SEC's rules implementing those provisions. It is not necessary for this purpose to conclude that all, or even most, of the charges of material omission and deception leveled against the proxy statement assert actionable wrongs. It is sufficient to rule, as the court does, that there is in the complaint a series of allegations which may amount in the end to violations of the duties of full and fair disclosure commanded by the cited statutes and regulations.

The basic character of the merger transaction, and its potential for tense conflicts of interest among corporate fiduciaries, must be seen as the starting-point for thought about this controversy.

We all know, as defendants acknowledge, that those who organized the merger had interests, or at least potential interests, different from, and very possibly at war with, those of the minority public stockholders who were to find themselves divested willy nilly of their ownership shares in a great corporation. It is a familiar reality that "parent-subsidiary mergers are not exercises in altruism." Brudney & Chirelstein, *Fair Shares in Corporate Mergers and Takeovers*, 88 Harv.L.Rev. 297, 309 n. 33 (1974). Presuming initially all the good faith .in the world, we may not blink the fact that "self-dealing schemes and transactions are by nature secretive." *Popkin v. Bishop*, 464 F.2d 714, 720 (2d Cir. 1972). The setting is one in which "self-dealing," however virtuously managed, describes the character of the transaction. The sufficiency of the complaint, as against a motion to dismiss, must be judged in that setting.

Knowing how the matter stood, those who wrote the proxy statement, themselves in a fiduciary relationship to the public minority shareholders,[4] gave repeated assurances on a key proposition —that they had approved, and were now seeking approval of, the merger in the view that it would be "fair and equitable" to the minority public stockholders. They described the retention of "Lionel D. Edie & Company, Incorporated * * * to make a study of the Merger and make a determination on behalf of the [minority] holders of Common Stock * * * as to whether or not the terms of the Merger are fair and equitable to such holders." They gave Edie's as well as their own assurances that the transaction was indeed "fair and equitable" to the outside minority. They announced the conclusion that the price of $29 per share had been adjudged to be "fair and equitable" after paying "regard to such factors as the business, earnings and prospects of J & L Steel

and the market prices and book value of the Common Stock of J & L Steel."

The complaint alleges, however, that things omitted and unexplained about the "business, earnings and prospects"—especially the allegedly healthy prospects and valuable resources of J & L Steel—gave the minority an inadequate basis on which to judge for themselves whether what they were being offered was "fair and equitable" when appraised, *inter alia*, in light of what the controlling group was acquiring. When there is, as here, an affirmative representation by fiduciaries that they have determined a price to be fair and equitable, matters that otherwise might not have to be disclosed may require airing. Cf. *Emhart Corp. v. USM Corp.*, 403 F. Supp. 660 (D.Mass.1975) (Wyzanski, J.). It is not merely charged that the $29 per share was "unfair" without any "allegation or hint of * * * misrepresentation." *Popkin v. Bishop, supra,* at 716, 718. Rather, the complaint asserts an array of deceptions and omissions that are alleged to have rendered materially misleading defendants' repeated assurances that the merger price was "fair and equitable."

It is charged, for example, that the shareholders were not made effectively aware of the "true current asset" value of the shares for the purpose, among others, of encouraging them to vote for the merger and thereby waive appraisal rights; that a previously announced price of $25, followed by an unexplained increase to $29, operated as a manipulative device affecting the market price of J & L common; that the failure to state why such an increase was granted helped to make materially misleading defendants' assertion that the $29 itself was "fair;" that the failure to state that LTV had paid $42.50 a share for J & L common stock in 1968, when its earnings were lower, made material that was set forth in the prospectus mislead-

---

4. See *Southern Pac. Co. v. Bogert*, 250 U.S. 483, 487–88, 39 S.Ct. 533, 63 L.Ed. 1099 (1919) ; Note, *The Fiduciary Duty of Parent to Subsidiary Corporation*, 57 Va.L.Rev. 1223 (1971).

ing; and that the "true purpose or business reason" of the acquiring group was not disclosed, thereby making misleading the asserted reasons that were given (a charge that becomes at least conceivably colorable when one reads the somewhat abstract proxy account of a desire to remove "inhibitions on * * * corporate growth and flexibility" by acquiring the minority interest).

The court need not and does not opine that any of these allegations will survive fuller exploration of the underlying facts. It may be that following discovery and the development of a more detailed account most or all of what is now charged as omissions will be demonstrated to have been adequately disclosed on the face of the proxy materials. Other allegations may fail the necessary hurdle of materiality—an issue, however, which is not capable of final resolution on these motion papers.[5] Bearing in mind the risks of expanding too freely upon the effects of a bare pleading, the court rules simply that plaintiffs have said enough to entitle them to explore, under their federal law claims, facts still unknown both to them and to the court. Merely by way of example, they are entitled to know how those in control of LTV and of their corporation actually assessed the benefits to those who would survive after the removal of the "inhibitions." They are entitled to investigate how the J & L "prospects" were gauged by those in authority for LTV itself while they were simultaneously, and conflictedly, undertaking that appraisal from the viewpoint of the outsiders. The subtle and difficult question of how far asset values may or must (or must not) be evaluated to comply with the federal securities laws—a question surely not subject to the simplest varieties of the law's answers[6]— may lend itself to more confident appraisal after we know what evaluations, if any, were being used by those who acted on both sides of the deal, for the controlling corporation and, as fiduciaries, for the minority on the outside that plaintiffs undertake now to represent.[7]

 None of this is to suggest that the "fairness" of a transaction is, as such, a matter for federal scrutiny. Cf. *Popkin v. Bishop, supra; Kaufmann v. Lawrence*, 386 F.Supp. 12, 16 (S.D.N.Y. 1974); *Marshel v. AFW Fabric Corp.*, 398 F.Supp. 734, 737–38 (S.D.N.Y. 1975).[8] What the federal law does undertake to ensure, however, is that "shareholder approval is fairly sought and freely given," *Popkin v. Bishop, supra*, at 720, so that the public shareholders are positioned not only to effect "an intelligent exercise of their apprais-

6. See, e. g., *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1291–95 (2d Cir. 1973); *Denison Mines Limited v. Fibreboard Corp.*, 388 F.Supp. 812, 819–21 (D.Del.1974); *In re Brown Co. Securities Litigation*, 355 F. Supp. 574, 584 (S.D.N.Y.1973); *Christopher v. Time Inc.*, '74–'75 CCH Fed.Sec.L.Rep. ¶ 95,056 (S.D.N.Y.1975); *Speed v. Transamerica Corp.*, 99 F.Supp. 808 (D.Del.1951), modified on other grounds, 235 F.2d 369 (3rd Cir. 1956).

7. See Brudney & Chirelstein, *Fair Shares in Corporate Mergers and Takeovers, supra*, at 298:

"* * * To be sure, unilateral decision is unavoidable in this context and could not of itself constitute a violation of fiduciary duty. But given the evident, and indeed quite natural, tendency of management to view its obligations to the parent and its stockholders as primary, and to regard the subsidiary's public stockholders as outsiders, the value placed on the subsidiary's assets will often be as low as reasonable pessimism will allow."

8. Nor is it suggested that "motives" alone could be actionable, without misrepresentations or omissions which make statements, including those of motive, misleading. See *Green v. Santa Fe Industries, Inc.*, 391 F. Supp. 849 (S.D.N.Y.1975).

al rights," *id.* n. 16,[9] but also to pursue possible state remedies against unfair compulsion. See *Heyman v. Heyman,* 356 F.Supp. 958, 967–68 (S.D.N.Y.1973), cited and quoted approvingly in *Schlick v. Penn-Dixie Corporation,* 507 F.2d 374, 382 (2d Cir. 1974), cert. denied, 421 U. S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

It is in this light that the broad duty of disclosure must be measured. When, in addition, it is realized that all the materials for judgment about the merger were known peculiarly to defendant corporate officials, and that these defendants owed fiduciary obligations to plaintiff shareholders, we are not permitted to dismiss a complaint because is fails to specify things its drafters could not know. The broad charges, while they may be exploded in the end, are sufficient to require that defendants account for the evaluations, forecasts, appraisals, and other "prospects" upon which they assured the minority that the merger would be "fair and equitable" to them.

As to the pendent (state) claims, little need be added. It suffices to say they survive defendants' motion, along with the primary claims to which they are appended.

The motion to dismiss is denied. So ordered.

9. "[E]ven when the voting power of public shareholders is arithmetically useless, a detailed understanding of the terms and import of the merger may incline a greater number of them to seek appraisal * * *." Brudney & Chirelstein, *Fair Shares in Corporate* *Mergers and Takeovers, supra,* at 301; cf. *Schlick v. Penn-Dixie Cement Corporation,* 507 F.2d 374, 382–84 (2d Cir. 1974), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed. 2d 467 (1975).