Manes MERRIT et al., Appellants,

v.

LIBBY, McNEILL & LIBBY, et al., Appellees.

No. 1035, Docket 76–7136.

United States Court of Appeals, Second Circuit.

Argued March 29, 1976.

Decided April 5, 1976.

Stuart D. Wechsler and Edward Labaton, New York City (Kass, Goodkind, Wechsler & Gerstein, Shatzkin, Cooper, Labaton, Rudoff & Bandler, Nemser & Nemser, and Wolf Popper Ross Wolf & Jones, New York City, of counsel), for appellants.

R. John Cooper, New York City (Cravath, Swaine & Moore, New York City), for appellees.

Before OAKES and GURFEIN, Circuit Judges, and PIERCE, District Judge.*

GURFEIN, Circuit Judge:

This is an appeal from the denial of plaintiffs' motion for a preliminary injunction to restrain a short-form merger that was scheduled to take place on March 29, 1976 pursuant to a statutory thirty-day notice to shareholders and holders of convertible debentures under Section 904 of the Maine Business Corporation Act. The United States District Court for the Southern District of New York, Richard Owen, Judge, refused preliminary injunctive relief as unjustified under the tests set forth in *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247 (2 Cir. 1973). He found that there was no showing of likelihood of success on the merits and no showing of likely irreparable injury, and that there was also no showing that the claims going to the merits suggested by the plaintiffs created "a fair ground for litigation" combined with "a balance of hardships tipping decidedly toward the party requesting the preliminary relief." 483 F.2d at 250.

The denial of the injunction by the District Court followed upon a similar refusal

of the New York State Supreme Court (Greenfield, J.) to enjoin the merger. That decision was not appealed. *Tanzer Economic Associates, Inc. Profit Sharing Plan v. Universal Food Specialties, Inc.,* Misc.2d, 383 N.Y.S.2d 472 (Sup.Ct. 1976). We affirm the denial of a preliminary injunction by the District Court primarily on the ground that there is an adequate remedy at law.

In June and July of 1975, several class actions were begun in the Southern District challenging, under the federal securities laws, a tender offer made on May 29, 1975 by UFS Specialties, Inc. ("UFS")[1] for the outstanding common stock and convertible debentures of Libby, McNeill & Libby ("Libby"). At the time of the tender offer, UFS, a wholly-owned subsidiary of Nestle Alimentana, S.A. ("Nestle"), owned 61% of Libby's common stock. The tender offer was for $8.125 per share. The Offer to Purchase stated that if UFS obtained more than 90% of Libby's common stock, UFS intended to merge Libby into UFS. The Maine statute, which is generally known as a "short form merger" statute, permits the compulsory buyout of the remaining shareholders for cash. Soon after UFS had obtained about 92% of the common stock pursuant to the tender offer, its Board of Directors adopted a plan of merger under which the remaining Libby shareholders are to receive $8.125 per share, the same price as in the tender offer, subject to a right of appraisal under the Maine statute.

Despite the clear statement in June of ultimate intention to effect the merger, no effort was made during the pendency of the offer to restrain the tender offer or its possible concomitant, the merger which was to follow. Eight months went by, until on January 27, 1976, a few days before UFS was to mail the 30-day notice papers necessary to consummate the merger under Maine law to the remaining Libby shareholders (who now owned only about 8% of the company), plaintiffs moved for a preliminary injunction in the State Supreme

---

\* Honorable Lawrence W. Pierce, United States District Judge for the Southern District of New York, sitting by designation.

1. UFS was then known as Universal Food Specialties, Inc.

Court.[2] The decision denying the injunction came down on March 10. On March 19 plaintiffs moved for an injunction in the District Court on the ground of alleged violations of the Securities Exchange Act of 1934, over which the state court has no jurisdiction. It is from the denial of that motion that this appeal was taken on March 26, three days before the scheduled consummation of the merger. We have, accordingly, expedited our decision.

The plaintiffs contend that the matter is governed in their favor by our recent decisions in *Marshel v. AFW Fabric Corp.*, 533 F.2d 1277 (2 Cir. Feb. 13, 1976), and *Green v. Santa Fe Industries, Inc.*, 533 F.2d 1283 (2 Cir. Feb. 18, 1976), *rehearing en banc denied*, 533 F.2d 1309 (2 Cir. Mar. 10, 1976). We must distinguish between the two cases.

*Green* involved an appeal from a dismissal of the complaint and did not involve an order denying a preliminary injunction. We simply remanded for trial. In the case at bar we are not called upon to decide whether summary judgment or judgment on the pleadings is available, as was the case in *Green*. In *Marshel*, we reversed the denial of a preliminary injunction against a proposed merger under New York law. If *Marshel* is on all fours with this case, it is a binding precedent. But *Marshel* involved "a scheme by the appellees, having previously taken advantage of public financing, to appropriate for their personal benefit the entire stock ownership of Concord at a price determined by them and paid out of the corporate treasury at a cost of over $1,600,-000." 533 F.2d at 1280. The defendants had admitted that "AFW was organized solely as a vehicle to effectuate, in essence, a forced cash repurchase by Concord of its public stockholders' shares at a time and price determined entirely by the controlling stockholders and for their sole benefit." We said that "AFW has no function other than as a device facilitating the Weinsteins' attempt to utilize the state merger statute to accomplish indirectly what would be im-

possible to achieve through normal corporate processes because of settled law prohibiting the elimination of minority shareholders by vote of the majority." We held in *Marshel* that "[s]uch conduct is proscribed by the language of Section 10(b) [of the Securities Exchange Act of 1934] and Rule 10b–5." *Id.* at 1280.

Once we assumed, in *Marshel*, that such conduct was in violation of the federal securities laws, the ultimate result was a foregone conclusion, and, hence, a preliminary injunction was in order.

The case for the plaintiffs is not clear, as it was in *Marshel*, for several reasons. This is not a case where a shell corporation is used as a conduit for a forced merger by the simple device of transferring the shares owned in the transferor corporation to the transferee shell and the controlling shareholders put up no money but use corporate funds for their personal advantage. It is also not a case where the defendants admit that their *sole* motive is to rid themselves of the minority.

On the contrary, Nestle, the parent of UFS, has bought control of Libby by various methods. It bought stock in the open market, by a stand-by arrangement to pick up surplus shares on a subscription offer made by Libby to its shareholders and latterly by its own tender offer through UFS, for a total expenditure of about $100 million. The last tender offer alone required a fresh investment of about $34 million. Thus, we do not have the stark situation where the defendants clearly have chosen to force the elimination of the minority by the use of corporate funds solely for their personal advantage and for no business purpose. Indeed, the appellees plausibly assert that their primary purpose was to benefit the corporations, including Libby, by the merger.

The appellants have, through discovery, obtained a confidential report to the Board of Nestle by its president outlining the pros and cons of the contemplated action. This

---

2. The defendants, UFS and Nestle, sought and received permission from Justice Greenfield to proceed with mailing the statutory notice pa-

pers, after several hours of meetings in chambers to consider specific wording of items in the papers.

is the rare case where motivation is actually spelled out in a confidential writing. The report is not unequivocal, however. Adversaries may each draw comfort from it. It is not our province, at this juncture, to decide the dominant motivation, and whether, if proved, it would be sufficient to state a claim for relief. On the one hand, the memorandum stated frankly that if one wanted to "force" the minority shareholders, success would come only by a tender offer to purchase followed by a "short form merger." On the other hand, it set forth the advantages and disadvantages of a further large investment in economic terms. Among factors noted as militating against the proposed merger were the then extant adverse economic situation and the likelihood that Libby was not a growth company and would depend almost totally on the research potential of Nestle to ensure its long-term development. The business advantages were also stated, among these being the following: (1) 70% of Libby's sales were in the United States, Canada and Puerto Rico, and it had contacts with farmers which would be useful in integrated selling to the underdeveloped countries. (2) Libby had a healthy balance sheet and a cash flow slightly higher than its future investment possibilities, and its stock was valued at only a third of book value.

The memorandum went on to state: "A third advantage, although more marginal, seems to us to lie in the very fact of eliminating the minority stockholders." While conceding that the study had not defined the industrial and commercial synergies which could be anticipated, it noted that it was foreseeable that an elimination of the minority would make it possible to simplify the allocation of development programs (which presumably were then limited by corporate boundaries) and would result in making the collection of royalties and certain management operations easier. It would also permit structural modifications which, in the past, would have run the risk of damaging minority interests (presumably in corporate opportunity and conflict of interest). The confidential memorandum then projected savings on the order of $4.3 million annually, that is, if $34 million was put up for the tender offer. Finally, the memorandum took note of the condition of the stock market which is "possibly not everlasting or recurring in the future," and commented regarding the antitrust situation in the United States that "the transaction is desirable, since any other investment in the foodstuff area is prohibited to us right now." The memorandum also stated: "Finally, the transaction is also possible since legislation permits easy elimination of minority stockholders; at this moment, we have every reason to believe that the S.E.C., in the future, will not retain the provisions in effect in this area."

We have adverted to the memorandum in some detail, because, if authenticated, it may be the best evidence of the conflicting elements that entered into the corporate decision. But like the legislative history of some ambiguous statutes, it does not lead us to the clear conclusion that the appellants will succeed on the merits. Nor does it indicate that the merger will result in irreparable injury to the plaintiffs, a concomitant requirement. See *Stark v. New York Stock Exchange, Inc.*, 466 F.2d 743, 744 (2 Cir. 1972).

We base our decision that the denial of the injunction was proper on the firm conclusion that there is an adequate remedy in damages at law should appellants prevail on the merits. See *Sanders v. Air Line Pilots Association, International*, 473 F.2d 244, 248 (2 Cir. 1972); *Slade v. Shearson, Hammill & Co.*, 356 F.Supp. 304, 306 (S.D.N.Y.), aff'd *mem. sub nom. Odette v. Shearson, Hammill & Co.*, 486 F.2d 1395 (2 Cir. 1973). If there has, indeed, been a violation of federal law, appellants are not bound by the state remedy of appraisal with which they express such displeasure but have an additional federal remedy. For those who tendered their shares pursuant to the original tender offer, the time for enjoining that offer has passed. But if there was a violation of the rules affecting tender offers such as material omissions or misrepresentations, relief can still be won. *J. I. Case*

**1314**

*Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). For those who refused to tender and who are now faced with the short form merger, their damages can be measured in terms different from those applicable in state appraisal proceedings.[3] Such restrictive theories of valuation are not binding on federal courts when actual damages are sought for violations of the federal securities laws. See *Green v. Santa Fe Industries, Inc., supra,* 533 F.2d at 1286. The law of damages may, indeed, be developing. See Brudney & Chirelstein, *Fair Shares in Corporate Mergers and Takeovers,* 88 Harv.L.Rev. 297 (1974). We need not speculate, however, on what the proper measure of damages would be if liability is found.

Moreover, we must, in assessing the equities, remember that appellees put out a tender offer which disclosed their ultimate goal. Appellants stood by and let them spend the cash that brought them to 92% stock ownership of Libby without seeking to enjoin the tender offer. While the failure to seek timely injunctive relief is not an estoppel against seeking money damages, it should weigh in the scale when a court of equity considers injunctive relief in the midst of what appellants themselves call the second step of a single integrated transaction. Delay may cause irreparable damages to appellees if their estimate of synergistic savings is right.

The balance of equities, therefore, lends further support to the reasons previously given for affirming the denial of a preliminary injunction.

We need hardly add that we have not purported to pass on whether there were material omissions or misstatements in the tender offer, as we are asked to do by appellants, nor do we foreclose appellants' arguments that the procedures used constituted a scheme in violation of Rule 10b–5.

Affirmed.

**3.** The same general considerations relating to the adequacy of damages also apply to the convertible debenture holders who are plaintiffs, though we do not foreclose any other post-merger remedy they may have based on the terms of the indenture. See *J. I. Case Co. v. Borak, supra,* 377 U.S. at 435, 84 S.Ct. at 1561, 12 L.Ed.2d at 429.