Manes **MERRIT,** Lee Kaplan, Milton Fisher, Jane W. McCune, Frank Czerwinski and Helen L. Goldstein as Custodian for Sydney David Goldstein, Plaintiffs,

v.

**LIBBY, McNEILL & LIBBY,** Universal Food Specialties, Inc., Nestle Alimentana, S.A., Douglas B. Wells, Stafford Campbell, Herbert C. Cornuelle, Eric R. Gabus, Gerard J. Cogniat, David E. Guerrant, Lyndle W. Hess, Frank W. Hoch, Alexander A. Robichek, John C. Sluder, Alfred E. Sulzer, Maynard P. Venema, Theodore Waldesbuhl, the Nestle Company, Inc., Inveslac, Inc., Unilac, Inc. and Lehman Brothers, Incorporated, Defendants.

Nos. 75 Civ. 2703, 75 Civ. 2795, 75 Civ. 2862, 75 Civ. 3117, 75 Civ. 3746.

United States District Court,
S. D. New York.

Jan. 26, 1981.

---

Kass, Goodkind, Wechsler & Labaton, New York City (Stuart D. Wechsler, Edward Labaton, Joseph Sternberg, New York City, of counsel), for plaintiff Manes Merrit.

Nemser & Nemser, New York City (Stanley Nemser, Norman Nemser, New York City, of counsel), Kreindler & Kreindler, New York City (Ronald Litowitz, New York City, of counsel), for plaintiffs Lee Kaplan, Frank Czerwinski and Helen Goldstein.

Mayer, Brown & Platt, New York City (Everett L. Hollis, Patrick W. O'Brien, Chicago, Ill., Matthew A. Rooney, New York City, of counsel), White & Case, New York City (Thomas F. Kiernan, Richard Reinthaler, Dwight Healy, New York City, of counsel), for Libby, McNeill & Libby.

Cravath, Swaine & Moore, New York City (Allen F. Maulsby, Thomas J. Sweeney, III, Ellen T. Lowenthal, New York City, of counsel), for Nestle S.A., UFS, The Nestle Co., Inc.

Simpson, Thacher & Bartlett, New York City (Nancy McKenna, New York City, of counsel), for Lehman Bros.

## OPINION

OWEN, District Judge.

The five consolidated actions before me [1] have their common origin in (1) the tender offer made by Universal Food Specialties, Inc. ("UFS"), a wholly-owned subsidiary of Nestle Alimentana, S.A. ("Nestle"), pursuant to a written offer to purchase dated May 29, 1975, to acquire all of the outstanding common stock of Libby, McNeil & Libby ("Libby") and all of the outstanding Libby 5% Convertible Debentures due January 15, 1989 ("debentures"), and (2) the subsequent "short-form" merger, effective April 6, 1976, of Libby into UFS.[2] The complaint alleges, *inter alia*, that Nestle, UFS, Libby, the Nestle Company, Inc. ("American Nestle"), Unilac, Inc. ("Unilac"), a Panamanian holding company owned by Nestle, Inveslac, Inc. ("Inveslac"), a wholly owned subsidiary of Unilac, Lehman Brothers, Inc. ("Lehman"), and the Libby directors ("individual defendants") conspired to defraud plaintiffs in connection with the UFS tender offer and the merger of Libby into UFS in violation of §§ 10(b), 13(d), 14(e) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78m(d), 78n(e), 78t(a), as amended, and the rules promulgated thereunder, and the common law. Before me are several motions addressed to the pleadings: (1) defendants Nestle, UFS, and American Nestle (the "Nestle defendants"), Libby and the Libby directors (the "Libby defendants"), and Lehman move to dismiss the complaint for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment, pursuant to Fed.R.Civ.P. 56, and (2) American Nestle, the Libby defendants, and Lehman alternatively move to dismiss the complaint for failure to plead fraud with specificity, pursuant to Fed.R.Civ.P. 9(b). The threshold issue presented by defendants' motions is whether the complaint should be dismissed under *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), in which the Supreme Court held that "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." 430 U.S. at 479, 97 S.Ct. at 1304.

The relevant facts can be summarized as follows. In 1960 and 1963, Nestle made its first open market purchases of Libby common stock, giving it approximately 9% of the outstanding Libby common stock. Sometime in 1963, Nestle entered into a voting trust agreement with two groups of foreign investors, Fasco A.G. and the Paribas Corporation, which had previously acquired a total of 20% of the Libby common stock through a tender offer. The agreement provided that upon Nestle's acquisition of a 20% interest in Libby, the Nestle, Paribas, and Fasco interests would nominate representatives of the trust to positions on the Libby Board of Directors. This voting trust arrangement lasted until 1967, at which time Nestle acquired the interests of the other groups.[3] That stock acquisition

---

1. The five actions are: *Merrit v. Libby, McNeil & Libby, et al.*, 75 Civ. 2703; *Kaplan v. Universal Food Specialties, Inc.*, 75 Civ. 2750; *Czerwinski v. Universal Food Specialties, Inc., et al.*, 75 Civ. 3746; *Fisher v. Universal Food Specialties, Inc., et al.*, 75 Civ. 2862; *McCune v. Libby, McNeil & Libby et al.*, 75 Civ. 3117. *Merrit, Kaplan* and *Czerwinski* are brought on behalf of the former minority stockholders of Libby; *McCune* is brought on behalf of the holders of the Libby debentures. The court has not yet certified these actions as class actions.

2. On April 6, 1975, the effective date of the merger of Libby into UFS, UFS changed its name to Libby, McNeil & Libby. Unless otherwise indicated, all references in the opinion are to Libby, McNeil & Libby prior to the effective date of the merger.

3. The Nestle acquisition of the Paribas and Fasco share in Libby was accomplished through the participation of Unilac and Inveslac. Nestle Exhibit J, pp. 31 33.

gave Nestle a total of 36% of the Libby common stock, and four of the eleven positions on the Libby Board of Directors were filled with Nestle nominees.

During 1969, Nestle dramatically increased its financial commitment to Libby, which up to that point had been only an equity interest, by extending a $10.5 million, unsecured, one-year loan at an interest rate of 9½%. At the same time, Libby arranged for $100 million revolving credit loan from a bank syndicate to cover the period from September 10, 1969 to May 29, 1970. In May of 1970, the banks allegedly insisted, as a condition for the renewal of the credit line, that Nestle's $10.5 million loan be renewed for an additional 15 months and subordinated to the bank loans or that the loan principal be converted into an equity interest. In March 1970, Nestle agreed to extend and subordinate its loan, and the banks thereafter renewed their revolving credit agreement with Libby. On October 28, 1970, for reasons that are in sharp dispute, Libby announced that its Board of Directors and shareholders had authorized a subscription offer, pursuant to which each shareholder was offered the right to purchase one additional share for each Libby share owned by them and certain oversubscription rights to purchase shares not bought by others. (the "subscription offer") The prospectus accompanying the subscription offer, as well as Nestle's report to the Securities Exchange Commission ("SEC") pursuant to Rule 13D, 17 C.F.R. 240.13d–1 ("Schedule 13D"), revealed that Nestle intended to acquire a majority interest in Libby through purchases made under the terms of the subscription offer. In fact, Nestle's acquisition of

3,010,454 additional Libby shares provided it with a 51.6% ownership interest in Libby.

Between 1970 and 1974, Nestle purchased additional Libby shares on the open market.[4] During this time, the Federal Trade Commission ("FTC") was investigating whether, given Nestle's substantial equity interest in Libby, Nestle had run afoul of the antitrust laws with its March 1973 acquisition of another food industry enterprise, the Stouffer Corporation. In late 1973, faced with the prospect of an FTC order to divest itself of its Libby holdings, Nestle began considering the financial implications of alternative methods of divestment including the elimination of Libby's minority shareholders and the subsequent sale of Libby as a going concern. Finally, on May 29, 1975, after consultations with Lehman, its investment advisor, and an Advisory Committee composed of certain Nestle appointees to the Libby Board of Directors, Nestle caused UFS, to whom Nestle had transferred its 65% interest in Libby, to make an Offer to Purchase all of the outstanding Libby common stock and Libby's 5% convertible subordinated debentures due January 15, 1979. Under the terms of the offer, UFS agreed to pay $8⅛ in cash for each share of common stock tendered[5] and $700 per $1000 principal amount for each debenture tendered.[6] The UFS offer to purchase stated that if UFS, as a result of the tender offer, exceeded 90% stock ownership, Libby would be merged into UFS. Pursuant to the tender offer, UFS acquired 2,966,869 shares of Libby common stock; UFS also purchased $11,908,000 in principal amount of the Libby debentures, amounting to 79% of the outstanding indebtedness.

---

4. There is substantial dispute over Nestle's motivation for these purchases. Nestle contends that these acquisitions were necessitated by the requirement of certain lenders that Nestle maintain a majority stock position in Libby. Plaintiffs, on the other hand, argue that these steps were part of Nestle's long-standing plan to effect a freeze-out of the minority shareholders. This is certainly an issue of fact which, along with so many other of plaintiffs' allegations, can only be resolved at trial by the trier of fact.

5. On the last day of trading before the announcement of the tender offer, the Libby common stock closed at $4⅞ on the New York Stock exchange.

6. The Libby debentures traded at $58 per $100 principal amount on the last trading day before the announcement of the tender offer.

On February 26, 1976, consistent with its representations in the Offer to Purchase, UFS notified the Libby shareholders and debentureholders that, pursuant to the Maine and Delaware short-form merger statutes, Libby was being merged into UFS. Under the terms of the merger each shareholder was entitled to receive $8⅛ for each share of common stock or to request an appraisal of the fair value of their shares.[7] The debentureholders were given two options: (1) they could continue to hold their debentures until redemption, thereby receiving the regular 5% interest payments until 1989[8] or (2) they could convert their debentures into $500.74 in cash for each $1000 principal amount of debentures.[9] On March 26, 1976, three days before the effective date of the merger and eight months after the filing of the complaint, the plaintiffs sought a preliminary injunction enjoining the merger. This court denied plaintiffs' motion and its decision was affirmed on appeal. *Merrit v. Libby, McNeil & Libby*, 533 F.2d 1310 (2d Cir. 1976).[10]

## II. *The Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6)*

■ The defendants contend that the Supreme Court's decision in *Santa Fe v. Green* and its progeny requires dismissal of the complaint. The plaintiffs in *Santa Fe*, not unlike the plaintiffs herein, alleged that the defendants had violated the federal securities laws by virtue of their undervaluation of the minority shares in connection with a short-form merger under Delaware law. The lower court held that plaintiffs could recover damages under § 10(b) of the 1934 Act[11] where a majority shareholder allegedly effected a statutory merger under Delaware law for the sole purpose of eliminating the minority stockholder. The Supreme Court reversed, holding that Congress did not intend § 10(b) to regulate transactions which constitute no more than

---

**7.** The Libby shareholders were also informed of their appraisal rights under Maine law, 12 A M.R.S.A. § 909 (1974), and several shareholders availed themselves of this remedy. *See In re Valuation of Common Stock of Libby, McNeil & Libby*, No. 76–440, Slip Op. at 11 (Sept. 12, 1978).

**8.** In April and May 1976, Nestle made a second tender offer for the remaining debentures at $700 per $1000 principal amount, the price offered the debenture holders in the UFS tender offer. As a result of this offering, Nestle and UFS increased their combined ownership of the Libby debentures to 87.5%.

**9.** The $500.74 conversion rate was determined by multiplying $8⅛ per share times the number of shares into which each $1000.00 of principal amount could be converted immediately prior to merger.

**10.** A similar motion for injunctive relief brought in the state court was also denied. *Tanzer Economic Associates, Inc. Profit Sharing Plan v. United Food Specialties, Inc.*, 87 Misc.2d 167, 383 N.Y.S.2d 472 (Sup.Ct.1976).

**11.** Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) provides:

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5 promulgated by the Securities Exchange Commission under § 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. 240.10b-5.

corporate mismanagement or a breach of fiduciary duty. 430 U.S. at 479, 97 S.Ct. at 1304 (citation omitted). The Court expressly rejected the view that Rule 10b–5, 17 C.F.R. § 240.10b–5, embodied a "federal fiduciary principle" which was different from that applicable under state law. *id.* Foreshadowing the Court's later pronouncements in *Touche Ross & Co. v. Reddington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) and *TransAmerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) on the significance of legislative intent in determining the scope of the antifraud provisions of the federal securities laws, Justice White observed that "[a]bsent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." 430 U.S. at 479, 97 S.Ct. at 1304. Thus, the teaching of *Santa Fe* is that the antifraud provisions of the federal securities laws are ancillary to the 1934 Act's "fundamental purpose" of "full and fair disclosure," and once disclosure has been made, it is state corporate law that governs the fairness of a transaction. *See Popkin v. Bishop,* 464 F.2d 714 (2d Cir. 1972).

In assessing the sufficiency of the complaint in light of *Santa Fe* the court is required to deem the allegations in the complaint as true, *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972), and is precluded from dismissing the complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). I conclude that the complaint states a claim under the federal securities laws.

■ Notwithstanding the fact that certain of plaintiffs' allegations are insufficient under *Santa Fe* because the averments amount to little more than objections to the fairness of the UFS-Libby transac-

tion cast in the language of nondisclosure, *Altman v. Knight,* 431 F.Supp. 309 (S.D.N.Y.1977), *Dent v. Heller Robers Instruments Corp.* [1977–78 Transfer Binder] CCH Fed. Sec.L.Rep. ¶ 96,060 (E.D.N.Y. April 22, 1977), several of the alleged nondisclosures present cognizable claims under the antifraud provisions of the federal securities laws. As Judge Friendly stated in *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir. 1977),

[W]e do not read Green as ruling that no action lies under Rule 10b–5 when a controlling corporation causes a partly owned subsidiary to sell its securities to the parent in a fraudulent transaction and fails to make a disclosure or, as can be alleged here, makes a misleading disclosure.

*Id.* at 218. Thus, although a breach of fiduciary duty by majority stockholders, without deception, misrepresentation, or nondisclosure, does not violate the statute and the Rule, 567 F.2d at 218, allegations of material misstatements or omissions in connection with the purchase or sale of securities do state a claim under the 1934 Act.

Turning to the complaint, plaintiffs allege that the Nestle defendants failed to disclose in their offering circular or in their SEC filings that the market price of the Libby common stock and debentures "were the result of a market artificially depressed by the acts and conduct of the defendants." Complaint ¶ 45(a). The essence of plaintiffs' claim here is that, in 1974, Nestle caused Libby not to reinstate its policy of cash dividend distribution, which had been terminated in 1961, and to suspend issuance of stock dividends in lieu of cash dividends in 1967. Plaintiffs contend that the Libby directors and Nestle acted in concert to perform these acts in an effort to depress the market price of Libby's common stock so as to facilitate Nestle's acquisition of Libby stock at bargain prices and to limit the total number of outstanding Libby shares.

■ Defendants, relying on *Marsh v. Armanda Corp.,* 533 F.2d 978 (6th Cir. 1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977), contend that the non-

payment of dividends for an improper purpose does not state a claim under § 10(b) or Rule 10b–5. The decision in *Marsh* is clearly inapposite. In *Marsh*, Armanda Corporation, a holder of 51% of common stock of Hoskins Manufacturing Company, made a written tender offer for the outstanding shares of Hoskins in which it announced its intention to eliminate the dividends previously paid to Hoskins' shareholders. Former shareholders of Hoskins sued under § 10(b) alleging that the elimination of their dividend rights was fraudulent *per se*. In rejecting plaintiffs' claim, the court noted that Armanda had not deceived or defrauded the shareholders by failing to make full disclosure. By contrast, plaintiffs herein allege two material nondisclosures. First, plaintiffs aver that defendants engaged in a "scheme to defraud" the Libby shareholders by causing Libby to eliminate cash and stock dividends in an effort to depress the market price of the Libby common stock. In addition, the complaint alleges that these acts were part of a larger scheme pursuant to which Nestle acquired the Libby shares at a "bargain" price. Whether plaintiffs will ultimately succeed in proving the existence of such a scheme to defraud will be determined at trial on the merits. As a pleading matter, however, the complaint states a claim under the antifraud provisions of the federal securities laws.[12]

■ Without attempting to provide an exhaustive list of the alleged material misstatements or omissions, it is important to note that the allegations in the complaint are not limited to the conspiracy theory discussed above. For example, plaintiffs contend that the statement in the UFS Offer to Purchase to the effect that "the Purchaser does not have any plan or proposal to liquidate the Company . . ." constituted a material misstatement of Nestle's intentions. While a plan to liquidate need not be disclosed to shareholders if it is inchoate, one that has been adopted by "high corporate officers over a period of time" must be disclosed. *See generally Otis Elevator Co. v. United Technologies Corp.*, 405 F.Supp. 960 (S.D.N.Y.1975). According to the complaint and documents submitted in connection with this motion, Nestle officials had evaluated the consequences of a potential FTC-ordered divestiture of Nestle's Libby holdings and concluded that the elimination of Libby's minority stockholders would facilitate Nestle's compliance with such an order.[13] Whether Nestle had, in fact, formulated a liquidation plan prior to the tender offer, or whether the tender offer was, as defendants assert, an attempt by Nestle to reap the economic benefits of such a combination, presents an issue of fact for trial.

Finally, contrary to defendants' argument that none of the alleged omissions or misstatements were "material" to the Libby

---

12. The securities fraud alleged in the complaint purportedly injured both the Libby shareholders and debenture holders. Plaintiff Fisher, whose standing to sue is challenged by defendants, was among those debentureholders who tendered prior to the Libby-UFS merger. Despite defendants contention that Fisher was neither a "purchaser" nor a "seller" as required by *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1974), it is clear that Fisher had standing to sue. One who is forced to sell his shares or debentures "as in indirect result of the defendant's fraud or illegal manipulation have standing to maintain a Section 10(b) action." *Weisman v. Darnielle*, [1977–1978 Transfer Binder], Fed.Sec.L.Rep. (CCH) ¶ 96, 278 (S.D.N.Y.1978). *Accord: Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir. 1967), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Crane*

*Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970).

13. Plaintiffs allege that the UFS Offer to Purchase falsely stated that the FTC investigation of Nestle's acquisition of a controlling interest in Stouffer and Libby had been terminated. It is plaintiffs' view that, notwithstanding a letter from the FTC to Nestle supposedly informing Nestle that the investigation had been closed, Nestle knew that the FTC was about to file a complaint attacking these acquisitions. Assuming *arguendo* that this allegation is true, this misstatement certainly would be "material" to a shareholder decision on whether to tender or to wait for a better offer from another company wishing to acquire Libby after an FTC ordered divestiture.

shareholders, I conclude that certain of the alleged omissions of misstatements were "material," in that there was "a substantial likelihood that the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). In deciding whether to tender at the price offered in the UFS Offer to Purchase, the Libby shareholders would have certainly found it significant—assuming plaintiffs' allegations are true—that Nestle was planning to sell Libby to another company at a premium over the price offered to the minority, or that Nestle and Libby had conspired to eliminate the cash and stock dividends. Thus, at least with respect to the matters discussed above, the allegations in the complaint state a claim of material nondisclosure.

III. *Defendants' Motion to Dismiss Pursuant to Rule 9(b)*

▮ Defendants also seek dismissal of the complaint on the ground that plaintiffs have failed to allege fraud with specificity. Rule 9(b) of the Federal Rules of Civil Procedure provides in pertinent part:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Some tension undoubtedly exists between the liberal pleading rules of Fed.R.Civ.P. 8, which encourages "short and concise" pleadings, and the particularity requirement of Rule 9(b). Given the seriousness of fraud allegations, however, Rule 9(b) was designed both to insure that plaintiffs have an adequate basis for such allegations and to provide defendants with sufficient information to frame a responsive pleading. *See Denny v. Barber,* 576 F.2d 465 (2d Cir. 1978); *Felton v. Walston and Co., Inc.,* 508 F.2d 577 (2d Cir. 1974). *See generally,* 5 C. Wright & A. Miller, Federal Practice & Procedure § 1298 (1969). Rule 9(b) does not, however, require plaintiffs in a securi-

ties fraud case to set forth facts which, because no discovery has yet occurred, are in the exclusive possession of the defendants. See *Segal v. Gordon,* 467 F.2d 602 (2d Cir. 1972); *Green v. Hamilton International Corp.,* 437 F.Supp. 723 (S.D.N.Y.1977). Here, although the complaint does not detail every act performed in furtherance of the alleged conspiracy, it does meet the requirements of Rule 9(b).

There can be little question that, with respect to Nestle and Libby, the complaint is sufficiently detailed. For example, as was discussed above, the complaint alleges that Libby conspired with Nestle to eliminate the shareholders' dividend rights. Complaint ¶¶ 18, 19. In addition, the Libby directors, individual defendants herein, are alleged to have participated in the decision to eliminate the minority stockholders. Specifically, according to the complaint, the Libby directors authorized defendants Wells and Guerrcut to form an Advisory Committee to the Nestle Board for the purpose of preparing for Nestle a May 1975 report entitled "Libby-Acquisition of the Shares of Minority Shareholders." Complaint ¶¶ 31, 32. The court need not decide whether Libby and the individual directors, in fact, authorized the members of the Advisory Committee to assist Nestle in executing its allegedly fraudulent scheme to take over Libby. All that is necessary at this stage is for plaintiffs to have alleged fraud on the part of Libby and its directors with sufficient particularity to defeat a motion to dismiss pursuant to Rule 9(b). *See Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080 (S.D.N.Y.1977). I find that they have done so.

The complaint also describes Lehman's participation in Nestle's acquisition of Libby in enough detail to permit a responsive pleading. Indeed, the complaint provides a chronology of actions taken by Lehman between 1973 and 1975 on behalf of Nestle. Complaint ¶¶ 22–30. Beginning with Lehman's May 1975 report allegedly recommending various methods for eliminating Libby's minority shareholders and ending with Lehman's role as the Dealer Manager

of the tender offer, the complaint adequately sets forth the extent of Lehman's participation as an alleged co-conspirator in Nestle's scheme to defraud the Libby shareholders. *See Edwards & Hanley v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478 (2d Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). Lehman protests that it is innocent of any wrongdoing, and that it merely acted as an investment advisor to Nestle. The issue of Lehman's culpability, however, is not a matter which can be resolved at the pleading stage, but will have to await further discovery.

IV. *Conclusion*

In *Tanzer v. Haynie*, 405 F.Supp. 650 (S.D.N.Y.1976), another case in which a majority shareholder sought to eliminate the minority shareholders, the court observed that

> [w]e all know, as defendants acknowledge, that those who organized the merger had interests, different from, and very possibly at war with, those of the minority public stockholders who were to find themselves divested willy nilly of their ownership shares ... The setting is one in which 'self dealing,' however, virtuously managed, describes the character of the transaction.

405 F.Supp. at 653–4. Against this background, and because under the doctrine of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1960) the plaintiffs state law claims for breach of fiduciary duty will be tried in this court, "it is not necessary for this purpose to conclude that all, or even most, of the charges of material omission and deception" leveled against the defendant be actionable under the federal securities laws. *Id.* at 654. It is sufficient for today's decision to conclude, as discussed above, that several of the allegations charge violations of the antifraud provisions of the federal securities laws.

Accordingly, the defendants' motions to dismiss are denied.

So ordered.