OPINION OF THE COURT
Edward J. Greenfield, J.
After trial, this court makes the following findings of fact and conclusions of law:
The controversy involves a 17-story commercial office building located at 79 Madison Avenue in the Borough of Manhattan. The building had been owned for many years by a corporation known as 79 Realty Corporation. That corporation was controlled by the Kimmelman-Zauderer interests who owned approximately two thirds of the shares of the stock, with a minority interest being held by the plaintiffs, Jack Alpert, Joseph Alpert, Charles Alpert and Bonn & Company, among others. The minority owned approximately one third of the shares, and 26% was owned by the plaintiffs herein.
In mid-1979, Robert Carmel, on behalf of the Williams Real Estate Company, began to discuss with Messrs. Kimmelman and Zauderer the purchase of the building at 79 Madison Avenue. First a price of $5,500,000 was mentioned by Mr. Kimmelman. By early 1980, he was asking $6,000,000 and then $6,300,000.
At that point, another potential buyer, Aaron Diamond, had lost interest in acquiring the property and the proposition was put to Mr. Jerome Cohen, the president of Williams Real Estate Company.
*514 A net figure of $6,350,000 was agreed upon at first. It was later increased to $6,500,000.
Analysis was made of the prospective capital maintenance expenses and of what the prospects of the building would be in the future based upon an analysis of the existing leases, what was then being charged, and what the potential was for charging the tenants upon the renewal of those leases as they came up. It, appearing to be an attractive proposition, was discussed with Citibank. After Citibank had reviewed and analyzed the figures, an agreement was worked out that Citibank, through its trust and pension funds held by an entity known as Reef 79, would put up 80% of the funds, and that the Williams Real Estate Company interests would form a partnership known as Williams 79 which would put up 20% of the funds, and that together Williams 79 and Reef 79 would form a limited partnership known as Madison 28, which would acquire the 67% stock interest of Kimmelman and Zauderer and then proceed to offer the same price per share to the minority stockholders, in order to acquire 100% of the shares of 79 Realty Company.
The avowed purpose of the acquisition of 100% of 79 Realty Company was then to dissolve that corporation and to have the fee ownership devolve to the limited partnership interests.
In accordance with this plan, on June 2,1980, a contract was entered into for the purchase of the Kimmelman-Zauderer interests with the closing to take place in September of 1980. Before that closing could take place, inquiry had been made of Mr. Alpert as to whether he was amenable to the selling of his shares. While he did not give any affirmative indication at that time, he thereafter commenced litigation to prevent the transfer of ownership. Alpert proceeded vigorously to attempt to enjoin the meetings, the proposed merger, and dissolution of the corporation.
After the acquisition of the Kimmelman-Zauderer stock interests, Mr. Cohen became the sole officer and director of 79 Realty. In October of 1980, he named his associates Edward G. Roos, Robert Carmel and Edward Riguardi as directors of that corporation. They in turn called for a *515 shareholders’ meeting, having approved the concept of the merger in minutes which set forth the purposes at some length. A shareholders’ meeting was scheduled for November 5, 1980 for the purpose of approving the proposed merger.
The holding of that meeting was restrained by an ex parte temporary restraining order (T.R.O.), but on November 7,1980, upon the obtaining and posting of a $1,000,000 bond the T.R.O. was vacated and the shareholders’ meeting proceeded. At that meeting, the planned merger was approved, the mechanics of which were to buy out the minority shares at the same price that the majority shares had been acquired for, and then to dissolve the corporation for the beneficial purposes which the majority stockholders believed would accrue.
In connection with the proposed merger, a statement of intention was sent out to the shareholders outlining the planned procedure to be followed, together with the financial statement of 79 Realty Corporation as of the end of the previous year, December, 1979.
In this lawsuit, it is argued that there was no proper corporate purpose for the proposed merger and dissolution and that the business judgment of the directors was clouded by self-interest.
There is not, as I understand it, in this case, any claim of fraud or gross illegality. What is contended is twofold: That the proposed merger and dissolution was unfair; and that it was motivated by self-interest and not by unclouded and dispassionate views of directors acting as fiduciaries for a corporation.
Under the law, corporate directors elected by a majority of shareholders are accorded a great deal of leeway in their dealings with the corporation. The courts generally have adopted the view that any actions taken by directors which can be considered a proper exercise of business judgment are not to be reviewed in the courtroom. The forum for such considerations is the boardroom. If it appears that the directors have gone beyond their proper scope and what they are dealing with is not a business decision but something which unfairly impacts on shareholders, then that indeed may be subject to judicial review.
*516 Courts always must be wary of imposing themselves and their own views upon the proper exercise of business judgment by businessmen. The statutes clearly permit the kind of merger with which we are here dealing where the owners of two thirds of the corporate shares decide to merge that corporation with another entity, after which the corporation will lose its own corporate identity and its property will pass to other hands or, as in this case, into the hands of a limited partnership controlled 80% by Citibank and 20% by the Williams Real Estate interests.
The only limitation is one which is judicially engrafted, that is, that the merger must be for a legitimate corporate business purpose and not solely in the self-interest of majority shareholders who might otherwise be taking advantage of their leveraged position to the disadvantage of minorities unable to protect themselves by vote.
The authorities have been reviewed by this court and others in Tanzer Economic Assoc. v Universal Food Specialties (87 Misc 2d 167) and in Schulwolf v Cerro Corp. (86 Misc 2d 292) and elsewhere.
The focus of the inquiry must always be the purpose involved in situations where control is acquired and then the minority interests are sought to be eliminated. The inquiry must be whether that minority interest is eliminated solely for the financial betterment and aggrandizement of the majority holders or whether legitimate business purposes exist.
The standard which has been enunciated by the Appellate Division is whether there is some proper corporate purpose for the merger. And this court, in Tanzer (supra), used similar language in stating that the presence of a legitimate corporate business interest over and above the self-interest of the investors tends to negate the “raiding” or the “milking” which might justify the court’s equitable intervention.
In this case, five reasons were put forward as justification for the merger and dissolution. They were:
1. The dissolution of the corporation would mean the elimination of the corporate income tax and therefore the income realized from the property would be distributed *517 directly to the limited partnership, to the individuals who had proportionate interests in that limited partnership without having been diminished in any way by corporate taxation.
2. The establishment of a new basis for depreciation. 79 Realty Corp., having owned the building for many years, had acquired that building at a much lower basis than its present value and was writing off depreciation on the basis of that much lower figure. The acquisition of the property and its valuation at $6,500,000 would provide a much higher basis for that depreciation, meaning much more could be written off free of taxation, considerably enhancing the cash flow.
3. Future acquisition of a mortgage on the property, the proceeds of which could be distributed to members of the partnership with minimal tax impact.
4. To eliminate during the course of such proceedings contentious and belligerent minority stockholders who would have to be dealt with, accounted to and who might possibly litigate such future courses of action as the corporation took.
5. Since it was believed that additional capital would be necessary for rehabilitation and renovation of the building and since the new majority interests were prepared to put up $500,000 towards that end, it was felt that they would not have to call upon the minority stockholders to put up a proportionate share of such a fund. This renovation could then take place independent of utilization of the cash fund which was believed to be inadequate and thereafter the benefits which would ultimately flow from the expenditures for renovation would then come only to those who made the additional contribution and not the noncontributing minority shareholders.
Another ground, stated by Mr. Cohen, was to avoid compelling minority shareholders to make additional contributions, which has already been discussed above.
It is the contention of the plaintiffs in this case that of those announced beneficial purposes, most involved benefits to the individuals as shareholders, and not to the corporation, and that arguably the only corporate benefits *518 which would accrue were the making available of additional funds for renovation and rehabilitation.
As to that, it is the contention of the plaintiffs that such additional contribution was not, in fact, necessary, since there was adequate capital in the existing cash fund to take care of such renovations.
The issue then is whether the contemplated beneficial purposes must relate only to those benefits which accrued to a continuing and viable corporation, or whether there are legitimate business interests which could accrue to the individual majority stockholders.
In short, the question is, is the demise and extinction of the corporation ever a proper corporate benefit?
By definition, it cannot be beneficial to the corporation itself. The death of an organism is rarely deemed beneficial to that organism.
However, the death of one unit may indeed be beneficial to the continuing viability and survival of others of the species. I am not sure that courts which have heretofore considered “proper corporate purpose” or “legitimate corporate interest” mean, of necessity, to restrict those legitimate business purposes which make economic and business sense, and which do not involve taking advantage of a defenseless minority, to only those benefits which accrue directly to the corporation (see, e.g., Kavanaugh v Kavanaugh, 226 NY 185).
In my view, the terms “proper corporate purpose” or “legitimate corporate interest” are broad enough to comprehend legitimate interests which flow to individual shareholders. The corporation by itself has no mind, no heart, no intention, no goals. Those are imparted by the human beings who own and control it.
The corporation is set up to provide legal and economic benefit to those who invest in it, and participate in its activities. The ultimate goal of any corporation (other than a not-for-profit corporation) and the ultimate benefit that any corporation can bestow is to provide maximum economic returns to its shareholders.
This court, therefore, concludes that it is a legitimate and proper corporate purpose to take such steps, including *519 corporate dissolution, which will ultimately redound to the benefit of the shareholders, and that would include the elimination of corporate taxation on earnings, the availability of tax deductions to the individual, the availability of disbursing mortgage proceeds to individuals, the increased basis for depreciation and other factors.
It is a legitimate and proper corporate purpose, and has been so held in situations where a majority has acquired control, that a corporation can attempt to alleviate dispute and dissension by buying out minority interests. It is a proper corporate purpose, as this court has held in Halle & Stieglitz v Kolen & Empress Int. (NY County, index No. 18107/77, Dec. 20, 1981) to dissolve a corporation when the corporate costs, retention of counsel, the filing of annual statements with the Securities Exchange Commission and the dealing with minorities absorbs a substantial portion of the corporate earnings.
Similarly, then, this court concludes that although it is obviously to the self-interest of shareholders to maximize their economic benefits and minimize their liabilities, that that, in and of itself, does not deny legitimacy to a proposal to merge and dissolve a corporation.
The legitimacy of the corporate purpose is to be contrasted with self-interest in order to ascertain whether unconscionable advantage has been taken of minority stockholders. Obviously, self-interest, in and of itself, cannot negate an otherwise legitimate corporate transaction, since ultimately every such transaction must provide some kind of benefit to those who propose it.
Self-interest is not, under our economic system, a crime. It does not, in and of itself, undermine the validity of a whole host of business transactions. To state otherwise would require all our corporate directors to be self-denying, vestal virgins who would never consider the possibility of any action ever redounding to their own benefit.
Such selfless dedication may be appropriate for monastic life; it is not appropriate for business life in 20th-century America.
I conclude, therefore, as a matter of law, that the stated business purposes, elimination of taxation, new basis for *520 depreciation, mortgage benefits and ultimately receiving the benefits of individual contributions to a renovation fund are not, even though they result in economic benefit to those who voted for them, of such a nature as to deny the proposed merger and dissolution of legitimacy.
As indicated, the basic inquiry has to be whether there has been a fundamental unfairness and taking unconscionable advantage of a minority, using their funds to enhance the interests of the majority. That, of course, is milking, siphoning-off, and all the other epithets which have been condemned judicially and otherwise.
One may appropriately use one’s money and reap the benefits of the use of that money. One may not appropriately use other people’s money solely for one’s own benefit, making sure that no benefits flow to those whose funds are improperly used.
In this case, viewing the situation as a whole, this court perceives no fundamental unfairness in the plan proposed. The plaintiffs had acquired their shares at prices of somewhere between $40 and $50 per share. The defendants, after what this court finds to be an arm’s length negotiation with experienced real estate operators on the other side, and after having been compelled to pay a higher price than what was initially contemplated, ultimately agreed to a price of $483,487 per share. That was the price that was offered for acquisition of the controlling block of shares.
The defendants nevertheless extended that offer to the minority shareholders, even though economically their surrender of a minority interest would be of less value than the acquisition of a majority interest. If the tender price were accepted, the plaintiffs would be receiving more than 10 times their original investment. The book value of the shares, as of December 31,1979, was $63.23. The earnings per share of that year were $7.42.
The price that was being offered was approximately 65 times the last year’s earnings. It is true that the earnings were increasing considerably, and that there was a prospect of a greater increase in earnings in the years to come. Nevertheless, this court finds the price which was offered was a fair price. I am not attempting to fix a precise dollars *521 and cents amount for the value of the shares, but I find that a price which was far in excess of the book value, more than 65 times the last year’s earnings, or possibly 30 times the current year’s earnings, could not, under any view, be considered an unfair price.
This court heard the testimony of a real estate appraiser who stated that on the basis of a rent potential of $1,935,000 and a potential net return of $1,100,000 that capitalized earnings at 11% would result in an ascribed value to this property of $10,000,000. That, of course, was predicated on several factors.
One of those was a capitalization of the earnings at 11%. This at a time when 10-year government notes were going for 13.07%. It is questionable whether real estate investors would risk their funds for a return of their capital substantially below that which they could get in risk-free government obligations.
I find, therefore, that that capitalization rate was unrealistic. If the capitalization rate were 15% instead of 11%, the value of the property could be capitalized at in excess of $7,000,000. At a capitalization rate of 16.5%, which would take into account various of the risk and economic figures which make the investment less secure than government obligations, the capitalization value on the expert appraiser’s contemplated earnings would be $6,700,000.
The fact is, however, that at the time of this transaction, the corporation was not showing a net return of $1,106,000. The net return had fluctuated, but had been considerably below that figure for the last several years. In 1975, actual earnings from the property were $23,375. In 1976, $48,006. In 1977, $51,944. In 1978, a net loss of $16,847. In 1979, net earnings of $100,057.
While the books had not yet been closed on 1980, it could have been anticipated that earnings for that year would have been in the neighborhood of $200,000. Even considering the potential for increased gain over the years, the fact is that the price offered was many, many times the current earnings.
Under all those circumstances, the court cannot consider that the amounts being offered to the minority shareholders for their interests were improper, inadequate or uncon *522 scionable. The court, therefore, concludes that there was no attempt to take improper advantage of the minority shareholders and that the majority shareholders dealt fairly and equitably with the interests of the minority.
It is not significant to the court that Mr. Cohen, in determining the necessity for putting in an additional fund of $500,000 which had already been agreed to between the Williams Real Estate interest and Citibank, was not aware that cash funds in 79 Realty had increased by the time that this deal was consummated. They had contemplated that extensive repairs or renovations would have to be made in order to produce maximized rentals as the leases came up for renewal. The fact that they may have been mistaken as to the amount of the fund available in the corporate coffers would make no difference. The amount of cash available was to be fully taken into account and adjusted for at the time of closing. The utilization of those funds by the majority shareholders who thereafter eliminated the minority would have been open to serious questions.
I therefore conclude that the actual status of the cash fund as of the date of the closing was not a major consideration and would not result in any different conclusion as to the legitimate purposes for the proposed corporate merger and dissolution.
Accordingly, this court concludes that the merger transaction was not tainted with fraud, illegality, conflict of interest, or self-dealing. The court acknowledges the existence of the self-interest, but finds that that, in and of itself, does not lead to a finding that the self-interest was unfair to the minority.
It undoubtedly would have been preferable to have the transaction in which the majority shareholders and minority shareholders are in dispute reviewed by disinterested parties. In a question of evaluation, it is desirable that independent appraisers be employed to determine what a fair value would be for minority interests. Such an appraisal would, of necessity, depend upon an expert opinion as to what the fair market value of the property was. In this case, the necessity for such an outside indepéndent opinion is minimized by the fact that a fair market value for the property was fixed by a sale in an arm’s length *523 transaction in which the property was acquired from the Kimmelman-Zauderer interests, who fixed the price for the property at $6,500,000.
While other properties in the neighborhood may have sold at that time for more or for less, I see nothing here to indicate that the price agreed upon was not, indeed, a fair market price. We know nothing about the other buildings in the locality, as to their age, their state of repair, their rent roll, status of tenants, the uses to which the building was to be put and the like. Each building is just as different and unique as each individual in this world is different and unique.
The fair market value having been fixed in the market itself, there probably was no necessity for the reenforcement of an expert opinion. It might have been well to have some independent directors on the board to exercise their judgment as to whether the proposed merger and dissolution was fair to all parties. In ordinary circumstances, this court would prefer that that be standard procedure. It was not pursued here. But, I am convinced that the failure to have totally disinterested directors does not vitiate or taint the transaction if, viewed as a whole, the transaction is deemed to be fair. If, in retrospect, looking at the entire transaction a disinterested party such as this court can find no overreaching, then it cannot be said that self-interest has overextended itself as to require the condemnation of the entire transaction. (See, generally, Matter of Willcox v Stern, 18 NY2d 195.) An objective view is required. Since no independent directors were available, this court, in hindsight, applies an objective view.
Insofar as the legitimacy of the shareholders’ meeting which approved the merger transaction is concerned, this court finds no basis for declaring that that meeting and the resolutions there adopted were a nullity.
It is contended that there was a T.R.O. which prohibited that meeting originally scheduled for November 5, 1980 from going forward. Upon the filing of a $1,000,000 bond, the Justice then sitting in Special Term agreed to vacate the temporary restraining order which would permit the shareholders’ meeting to go forward.
*524 There was testimony before the court that the actual signing of the order took place at 4:40 p.m. on November 7, 1980. The minutes of the shareholders’ meeting recite that that meeting took place at 4:30 p.m. The testimony is that the meeting took place at approximately that hour in the belief and understanding that the T.R.O. had been dissolved.
Whether the shareholders’ meeting went forward at precisely 4:30 p.m., approximately 4:30 p.m., or thereafter is of no moment. The fact is that the T.R.O. was being dissolved and the attorney for the corporation and the principals had been informed that it was being dissolved, and that the meeting could go forward. To hold that a discrepancy as to the time of the meeting would render it a nullity is a conclusion this court is not prepared to reach.
Clearly the meeting could have taken place after 4:40 p.m. or the next day or the next week. The majority shareholders controlling 67% of the stock in the corporation had the power to put through the merger at any time. It would be a futile and meaningless act for this court to declare that because of some alleged time discrepancy amounting to only minutes, the resolutions which were adopted two years ago should be set aside so that they could be reenacted as of now. To require such acts would be fatuous.
If, indeed, the meeting went forward contrary to the terms of an existing T.R.O., such fact, standing alone, would not render the meeting and the acts taken as null and void. Any party acting in contravention of a temporary restraining order might be potentially subjecting himself to a contempt citation for flouting the order of the court, but I know of no authority which says that acts taken in contravention of a court order are a nullity and of necessity must fall. A citation for contempt would have to be done, however, on a showing of willful and contumacious conduct. I see none here. The parties who went forward with the meeting believed in good faith that the T.R.O. had been vacated and that they were authorized to do so. Whether they were a couple of minutes premature is of no significance.
*525 Plaintiff also contends that he was not notified of the adjourned date of the meeting and, therefore, the meeting was null and void. Notice was given to all shareholders for the meeting of November 5, since the T.R.O. was in effect and it was not known when it would be vacated, the shareholders’ meeting was adjourned sine die. As soon as it was contemplated that that T.R.O. would be vacated, the appropriate parties Were notified and then the meeting was reconvened. Those present at the meeting of November 5, 1980 knew and understood that that meeting was being adjourned pending vacatur of the T.R.O. Neither Mr. Alpert nor any other minority shareholder attended the meeting of November 5. Had the meeting been adjourned to a specific time and place, viz., November 7,1980 at 4:30 p.m., or whatever time, Mr. Alpert would not have received any greater notice since he was not there.
Mr. Brodsky has testified that indeed he attempted to communicate with Mr. Alpert through his attorney Mr. Bravin. There is some dispute as to whether he did or did not put through a call which was received.
I do not find that the adjournment without date necessitated the giving of a further written notice and that in the absence of such a further written notice, the shareholders’ meeting and all that happened there became null and void. As has been pointed out, notice of that meeting and of the results of the meeting were shortly thereafter distributed to all shareholders, including the minority shareholders. Had anyone sought to challenge the validity of that meeting and had it been done promptly the meeting could have been reconvened to reenact or ratify that which had previously taken place.
Even today the shareholders holding 67% of the stock could convene and ratify as of the date of the original enactment and make good any technical deficiency with respect to that shareholders’ meeting.
This court is not prepared to hold that because of any such alleged technical deficiency that all that has transpired in the last two years must be undone. The majority had the power, in November, 1980, and at all times thereafter, to put through this proposed merger and dissolution. To require all be undone because of. an alleged failure to *526 notify, which notice would not have made the slightest difference, is not a basis in the view of this court to compel a rescission of all which has taken place.
Accordingly, this court concludes that the shareholders’ meeting which approved the merger of 79 Realty Corporation with 28 Williams, a limited partnership, for the ultimate dissolution of 79 Realty Corporation was a legitimate and proper transaction not tainted by fraud or illegality; that there was no self-interest which resulted in unconscionability or overreaching; that the minority shareholders were dealt with fairly and equitably; and that there is no basis in law or in fact for the rescission of the transactions.
Accordingly, at the close of the trial, this court finds in favor of the defendants and dismisses the complaint.
I would like to commend counsel on both sides for their very expert presentation here.